**Gladys YOLTON, Wilbur Montgomery, Elsie Teas, Robert Betker, Edward Maynard, and Gary Halstead, on behalf of themselves and a similarly situated class, Plaintiffs,**

v.

**EL PASO TENNESSEE PIPELINE CO., and Case Corporation, a/k/a Case Power Equipment Corporation, Defendants**

**No. 02–75164.**

United States District Court, E.D. Michigan. Southern Division.

Dec. 31, 2003.

---

Norman C. Ankers, Honigman, Miller, (Detroit), Detroit, MI, Brian D. Sieve, Kirkland & Ellis (Chicago), Chicago, IL, for Case, L.L. C., Defendant.

William B. Forrest, Thomas G. Kienbaum, Kienbaum, Opperwall, (Birmingham), Birmingham, MI, Stephanie Goldstein, Fried, Frank, New York, NY, for El Paso Tennessee Pipeline Company, Defendant.

Roger J. McClow, Klimist, McKnight, Southfield, MI, for Edward Maynard, Elsie Teas, Gary Halstead, Gladys Yolton, Robert Betker, Wilbur Montgomery, Plaintiffs.

## OPINION

DUGGAN, District Judge.

Plaintiffs, six hourly retirees or surviving spouses of hourly retirees of the J.I. Case Company or the Case Corporation, filed this class action lawsuit seeking fully funded, lifetime retiree health care benefits. Plaintiffs brought their lawsuit on behalf of retirees and surviving spouses of retirees who retired from J.I. Case or the Case Corporation prior to July 1, 1994, the date when Case Corporation was spun-off from its parent corporation, Tenneco, Inc., and reorganized as an independent publicly owned company. The Court has not yet addressed Plaintiffs' motion for class certification. Presently before the Court is Plaintiffs' motion for preliminary injunction, filed March 21, 2003. A hearing on Plaintiffs' motion was conducted on October 30, 2003.

In their Complaint, Plaintiffs allege two counts against Defendants. In Count I, Plaintiffs allege that Defendants breached labor agreements in violation of Section 301 of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185, by requiring Plaintiffs to contribute substantial premiums to maintain their retiree or surviving spouse health care benefits. In Count II, Plaintiffs allege that Defendants breached their fiduciary duties under the various labor agreements which constitute employee welfare plans within the meaning of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

Defendants are El Paso Tennessee Pipeline Company and Case, LLC.[1] J.I. Case was established in 1842 and became a wholly owned subsidiary of Tenneco in 1970. In 1990, J.I. Case changed its name to Case Corporation ("Case").[2] Tenneco continued to operate Case as a wholly owned subsidiary until 1994.

In June 1994, Tenneco underwent a reorganization and decided to sell its agriculture and construction business assets, which consisted of some of Case's assets and some of Tenneco's assets. Pursuant to a Reorganization Agreement, Tenneco sold these assets to a "newly-formed" cor-

---

1. Plaintiffs name the Case Corporation, a/k/a Case Power Equipment Corporation, as a defendant, rather than Case, LLC. However the history of the various entities involved in this lawsuit, as set forth *infra*, indicates that the proper name of the defendant sued is Case, LLC. In fact, Case, LLC is the party which has responded to the Complaint.

2. Although some Plaintiffs or putative class members may have retired when the company still was named "J.I. Case," for case of reference the Court will refer to their employer, as well as Case Corporation, as "Case."

poration, Case Equipment Corporation ("Case Equipment"). On July 1, 1994, Case Equipment conducted an initial public offering ("IPO") of its shares and changed its name to Case Corporation. Then in September 2002, Case Corporation converted to a limited liability company, Case, LLC ("Case LLC").

In 1996, Tenneco merged with a subsidiary of El Paso Natural Gas Company and was renamed El Paso Tennessee Pipeline Company ("El Paso").

### I. *Factual and Procedural Background—The Relevant Labor Agreements and Other Documents*

The International Union, United Automobile, Aerospace and Agricultural Workers of America ("UAW") represented Case employees in collective bargaining. Case and the UAW negotiated a series of collective bargaining agreements ("CBAs"), referred to as Central Agreements.[3] Case and the UAW also negotiated a series of Group Insurance Plans which addressed group insurance benefits for various categories of employees and former employees.[4] Group insurance benefits include, *inter alia*, life insurance benefits, major medical expenses coverage, and prescription drug coverage. The Central Agreements between the UAW and Case from 1971 forward contain the following language with respect to the Group Insurance Plans ("GIPs"): "The group insurance plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement." *See* El Paso App., Vol. I, Ex. 2 A–H.

The 1971 Group Insurance Plan provides that employees retiring under Case's "Pension Plan for Hourly Paid Employees" or "their surviving spouses eligible to receive a spouse's pension under the provisions of that Plan are eligible for" Group Life Insurance, Major Medical Expense Insurance, and the Prescription Drug Plan. *See* Pls.' Exhibits, Vol. II, Ex. E at 26–27. Subsequent GIPs contain identical language. The 1971 Group Insurance Plan required the following "Contribution for Coverage" under the Major Medical Expense Insurance and Prescription Drug Plan:

(i) For eligible Retired Employees and Surviving Spouses who have enrolled and are age 65 or older, the Company *shall pay the full premium cost* of the above coverages.

(ii) Effective January 1, 1975, for eligible Retired Employees and Surviving Spouses who have enrolled and are under age 65, the Company *shall pay the full premium cost* of the above coverages.

*See id.* In subsequent GIPs, Case agreed to "pay the full premium cost" of health care coverage for eligible retirees and their surviving spouses, regardless of age. *See id.* Over the years, the provisions in the various GIPs addressing retiree health care benefits differed only in that Case agreed to provide additional health care benefits for retirees and their surviving spouses.

During the 1980's and 1990's, some Case employees retired when Case decided to close the facilities at which they worked. Prior to these plant closings, the UAW and Case entered into Plant Shutdown Agreements ("Shutdown Agreements"). In

---

**3.** Case maintained a number of facilities throughout the mid-western United States. Each location had a separate contract book comprised of the Central Agreement and the relevant Local Supplement. As the Central Agreements are the relevant document in these proceedings, the Court will not discuss the provisions of the Local Supplements.

**4.** Prior to 1971, the Group Insurance Plans were contained within the Central Agreements. From 1971 forward, the Group Insurance Plans were separate agreements.

1987, before Case closed its Rock Island, Bettendorf, and Terre Haute facilities, the UAW and Case entered into such an agreement. In 1993, the UAW and Case entered into a Shutdown Agreement after Case announced its intention to terminate activities at its Memphis Depot and Wausau plant and to cease most covered operations at its Hinsdale engineering center.

The Shutdown Agreements offered eligible employees three options when their positions were terminated: (A) layoff/master recall, (B) special plant shutdown retirement, or (C) severance pay. Employees selecting Option B received, among other entitlements, special early retirement pension benefits and the post-retirement medical coverage that apply generally to retired Case/UAW employees. The Shutdown Agreements specifically provide that Case representatives will fully explain the various options to eligible employees before they are required to make a selection.

The Shutdown Agreements required the UAW, for itself and on behalf of its members, to release and discharge Case from all claims "other than claims and obligations provided for in [the] Shutdown Agreement." *See, e.g.,* El Paso App., Vol II, Ex. 12 at CASELLC 02177. For example, the release clause in the 1987 Shutdown Agreement provides that the UAW, for itself and the employees who it represents, releases Case from all claims, *"except any claim which may be based upon an alleged violation of this Shutdown Agreement . . . and any claims pertaining to vested residual rights to pension benefits, life insurance or hospitalization/medical insurance."* *See* Pls.' Exhibits, Vol. III, Ex. U at 24 (emphasis added).

Faced with increasing financial problems, Case sought to reduce its workforce

in the early 1990's. To effectuate that goal, Case and the UAW entered into an "Agreement on Case Voluntary Employment Reduction Program" ("Early Retirement Incentive Program") in 1991. Some Case employees (including some putative class members) retired in 1991 and 1992 pursuant to this Early Retirement Incentive Program. Case offered employees four options under this program: (1) Special Early Retirement Benefit, (2) Voluntary Termination of Employment Benefit ("VTEP"), (3) Special Layoff with Partial VTEP Benefit, and (4) Special Layoff with Grow–In to Special Early Retirement Benefit. Plaintiffs who chose Special Early Retirement or chose to grow-in to such retirement were entitled to special pension benefits and "the post-retirement medical coverage and Medicare Part B premium payments that apply generally to retired Case/UAW employees."[5] *See* Case Exhibits, Vol. III, Ex. 21 at CASELLC 00244. The Early Retirement Incentive Program provides that employees may be required, as a condition for receiving a benefit, to sign a release or other binding agreement satisfactory to Case. *See id.* at CASELLC 00249.

The 1990 Central Agreement is the last CBA under which Plaintiffs and members of the putative class retired. That agreement was effective from June 2, 1990 through October 2, 1993. However on November 5, 1993, Case and the UAW entered into an Extension Agreement which extended the 1990 Central Agreement through February 2, 1995.

With respect to insurance benefits, Section 2 of the Extension Agreement provides that "[e]xcept for pension improvements, all wage schedules, pension benefit and insurance levels would remain in effect at the current schedule rates or levels for

---

**5.** Employees selecting "Special Layoff with Grow–In to Special Early Retirement Benefit" became entitled to special early retirement benefits once they attained age 50 and had at least 10 years of service. *See* Case Exhibits, Vol. III, Ex. 21 at CASELLC 00248.

the term of the Extension Agreement." *See* Pls.' Exhibits Vol II, Ex. G. In Section 9 of the Extension Agreement, however, Case and the UAW agreed to adopt, effective October 3, 1993, an appended Letter of Agreement (the "FAS–106 Letter") which appears to cap Case's liability for certain health care benefits.[6] The FAS–106 Letter, written by Case's Senior Vice–President to the UAW's Secretary–Treasurer, states:

> This will confirm our understanding that the average per capita annual cost to the Company of providing medical and related benefits under the Case Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed $2,750 for Medicare eligible individuals and $8,500 for those individuals who are not eligible for Medicare. Notwithstanding the foregoing, no covered person shall be required to pay a portion of any excess amount prior to April 1, 1998.

*See id.,* Att. B. The parties dispute the effect of the this letter.

Referring to the FAS–106 Letter as a "Cap Agreement," Defendants contend that Case and the UAW intended it to be a "cost sharing agreement" between Case and its retirees, whereby Case's obligations for retiree and surviving spouse health care benefits would be limited, effective April 1, 1998. Plaintiffs, on the other hand, contend that the UAW and Case only intended the FAS–106 Letter to serve as an accommodation, whereby the

UAW agreed to allow Case to temporarily reduce the FAS106 accounting figure that it reported on its financial records.[7]

On June 23, 1994, pursuant to Tenneco's sale of its and Case's farm and construction equipment assets to Case Equipment, Tenneco and Case, on the one hand, and Case Equipment,[8] on the other hand, signed a number of agreements, including a Reorganization Agreement and an Employee Benefits and Compensation Allocation Agreement ("Benefits Agreement"). Pursuant to the Reorganization Agreement, the parties sought to reorganize the farm and construction equipment business of Tenneco and its subsidiaries (e.g., Case) so that neither Case Equipment nor any of its subsidiaries would have any interest in any business of Tenneco and its subsidiaries ... and neither Tenneco nor any of its subsidiaries would have any interest in the farm and construction equipment business except by reason of "(i) their ownership of capital stock of [Case Equipment], the Demand Notes and the Subordinated Debt, (ii) the Retained Assets and (iii) the Retained Liabilities." *See* Case Exhibits, Vol. IV, Ex. 34 at CASELLC07074 (Art. III., Section 3.01). Tenneco assumed, with certain limitations, the Retained Liabilities and agreed to "pay, perform and discharge in due course all of the Retained Liabilities." *See id.* at CASELLC07076 (Art. III, Section 3.02(c)). Included in the Reorganization Agreement's definition of "Retained Liabilities" are the health care benefits currently in dispute:

---

**6.** FAS–106 refers to an accounting standard promulgated by the Financial Accounting Standards Board. Among other things, it required companies to report their post-retirement health care obligations on their financial statements on an accrual basis, rather than on a "pay-as-you-go" basis.

**7.** As discussed *infra,* the parties offer conflicting evidence as to whether the UAW and Case intended the FAS–106 Letter to serve as a cap

on retiree health care benefits or merely as an accommodation to Case for accounting purposes. Nevertheless, as also discussed *infra,* even if the UAW and Case intended the FAS–106 Letter to serve as a cap, that cap only could effect the rights of employees *retiring after* the effective date of the FAS–106 Letter.

**8.** In the Reorganization Agreement, Case Equipment is referred to as "Newco."

[T]he Case Liabilities for postretirement health and life insurance benefits (to the extent that Case is obligated on the Reorganization Date [June 23, 1994]) of retirees of the Case Business [9] in the United States and current employees of the Case Business in the United States who retire on or before July 1, 1994 and their dependents as more fully described in the Benefits Agreement.

*See id.* at CASELLC07071. Tenneco agreed to indemnify Case Equipment "from and against any and all Liabilities, and any claims, demands and rights of the [Case Equipment] Indemnitees arising out of or due to ... the failure or alleged failure of Tenneco or any Tenneco subsidiary to pay ... any of the Retained Liabilities ..." *See id.* at CASELLC07081.

The Benefits Agreement further defines Tenneco's and Case Equipment's liabilities with respect to labor, employment, compensation and benefit matters following the reorganization. Pursuant to Section 7.2.2, and subject to Section 7.4, the Benefits Agreement provides that Tenneco will "retain all liability with respect to postretirement health and life insurance benefits to the extent that Case is obligated on the Closing Date [i.e. the date of the agreement] for United States employees retired prior to the Closing Date and their Dependants" *See* Case Exhibits, Vol. IV, Ex. 37 at CASELLC07110 (Section 7.2.2). Section 7.4 establishes the following limitations on the liabilities Tenneco assumed:

Tenneco shall not be liable for any postretirement health and life insurance benefit costs which result from *any action* of [Case Equipment] *after the Closing Date* which increases such benefits,

except to the extent that such benefit increases are required by applicable law. To the extent that Tenneco is not liable for such benefits, [Case Equipment] shall be liable.

Without limiting the generality of the foregoing, it is specifically provided that Tenneco shall not be liable for any increase in the cost of providing postretirement health and life insurance benefits that result from any agreement by [Case Equipment] to increase or otherwise modify the per capita annual cost limits set forth in [the FAS–106 Letter]

*See id.*

Based on these agreements, Tenneco began paying the full cost of Plaintiffs' health care benefits in July or August 1994. In November 1996, Tenneco sent a letter to its retirees, informing them of its impending merger with El Paso and advising those individuals who retired from Case that their health care benefits would be maintained by El Paso after the merger.

On October 27, 1997, El Paso sent a letter to Plaintiffs informing them that they will be required to contribute $56 per month for health care coverage as of April 1, 1998. El Paso stated that it was authorized to seek this contribution based upon the FAS–106 Letter. El Paso also stated that it reserved "the right to make additional changes, including changes to the cost-sharing features of the plan." *See* Pls. Ex., Vol. I, Ex. D.

Prior to April 1, 1998, as part of their negotiations for a new CBA, the UAW asked Case LLC to pay the $56 per month contribution that El Paso sought from Pre–IPO retirees and their surviving spouses for their health care coverage.[10]

9. The term "Case Business" refers to the farm and construction business of Tenneco and its subsidiaries. *See id.* at CASELLC07067.

10. While these negotiations and subsequently described conduct occurred before Case Corporation acquired limited liability status, for case of reference the Court will refer to Case Corporation as Case LLC.

Case LLC contends that it had no legal obligation for these health care benefits, but agreed to pay the retirees' contributions "as a show of goodwill toward the UAW." On October 1, 1998, Case LLC and the UAW entered into an agreement (the "VEBA Agreement")[11] in which both parties agreed "to make deposits of specified amounts in trust to be applied to defray partially the cost of medical benefits in excess of the Cap under El Paso's medical plan for Pre–IPO Retirees and Surviving Spouses ..." See El Paso App., Vol. III, Ex. 41 at UAW1446. Case LLC contends that in the VEBA Agreement, the UAW agreed to fully release it from any further obligations with respect to any costs associated with pre-IPO retiree health care benefits. With respect to that contention, Section 3.3 of the agreement provides in part: "Obligations under this Plan shall be limited to the payment of Benefits provided in Article III of this Plan. Neither Case, the UAW, nor the Administrator shall be responsible by reason of this Plan for payment of any benefits due to covered individuals under the El Paso Medical Plan." See id. at UAW1452.

On November 5, 1997,[12] Case LLC sent pre-IPO retirees and their surviving spouses a letter, informing them that the company would be pay their $56 per month health insurance premium through the end of 1998. Case LLC further wrote: "We expect to be discussing the longer term issues involved in your El Paso plan during our upcoming contract negotiations." See Case Exhibits, Vol. IV, Ex. 42.

In the Summer of 2002, when the VEBA funds contributed by Case LLC and the UAW were exhausted, the UAW asked Case LLC and El Paso to make additional contributions to fund the above-cap health insurance costs for pre-IPO retirees. Both entities refused. In August 2002, El Paso sent a letter to pre-IPO retirees and their surviving spouses, informing them that they would have to contribute $290 per month in order to continue receiving their retiree health care benefits. In December, El Paso sent another letter to pre-IPO retirees and their surviving spouses, notifying them that their premiums would increase to $501 per month beginning in January 2003. Plaintiffs filed this lawsuit on December 23, 2002.

## II. Issues Presented

Plaintiffs' motion for preliminary injunction raises a number of issues. First, whether Plaintiffs are entitled to fully funded, lifetime health care benefits under the relevant labor agreements. Second, whether El Paso and/or Case LLC are liable for those employee welfare benefits. Finally, if El Paso and Case LLC are liable, what is the extent of each company's liability.

## III. Standard for Issuing a Preliminary Injunction

To determine whether to grant Plaintiffs' motion for preliminary injunction, the Court must consider four factors: (1) Plaintiffs' likelihood of success on the merits; (2) whether Plaintiffs will suffer irreparable harm without the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. Golden v. Kelsey–Hayes Co., 73

---

**11.** The agreement is referred to as the VEBA Agreement because the trust established was a "voluntary employee beneficiary association," pursuant to the requirements for tax exemption under Internal Revenue Code § 501(c)(9). See El Paso App., Vol. III, Ex. 40 at 3.

**12.** It appears that this date is an error or that Case informed the retirees and surviving spouses of its contribution before the VEBA Agreement was executed.

F.3d 648, 653 (6th Cir.1996)(citing *Performance Unlimited v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995)). The Court must balance all four factors. *Id.* "None of these factors, standing alone, is a prerequisite to relief ..." *Id.* (citing *In re DeLorean Motor Co.*, 755 F.2d 1223, 1228 (6th Cir.1985)).

## IV. *Plaintiffs' Likelihood of Success on the Merits*

Plaintiffs are likely to succeed in this action if the relevant labor agreements between the UAW and Case guaranteed them a vested right to receive fully funded, lifetime health insurance benefits.

### A. Applicable Law

■ A retiree health insurance benefit plan is a welfare benefit plan under ERISA. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir.2000)(citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir.1993)). Unlike pension plans, welfare benefit plans are not subject to mandatory vesting requirements under ERISA. *Id.* Thus courts have held that "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Bittinger v. Tecumseh Prod. Co.*, 83 F.Supp.2d 851, 857 (E.D.Mich.1998)(quoting, *Am. Fed'n of Grain Millers v. Int'l Multifoods*, 116 F.3d 976, 979 (2d. Cir.1997)). The parties to a CBA may agree, however, that the benefits provided for in the CBA will vest and thus survive the termination of the CBA. *Maurer*, 212 F.3d at 914. If the parties intended the benefits to vest for the lifetime of the retirees, the employer's unilateral modification or reduction of those benefits will constitute an LMRA violation. *Id.* (citing *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1298 (6th Cir.1991)).

■ The Sixth Circuit Court of Appeal's decision in *UAW v. Yard–Man, Inc.*, 716 F.2d 1476, 1479 (1983), sets forth the guiding principles for determining whether the parties to a CBA intended for retiree health insurance benefits to vest. Pursuant to these principles, courts must apply basic rules of contract interpretation to discern the intent of the parties:

> The court should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent ... The court should also interpret each provision in question as part of the integrated whole. If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties. As in all contracts, the collective bargaining agreement's terms must be construed so as to render none nugatory and avoid illusory promises. Where ambiguities exist, the court may look to other words and phrases in the collective bargaining agreement for guidance. Variations in language used in other durational provisions of the agreement may, for example, provide inferences of intent useful in clarifying a provision whose intended duration is ambiguous. Finally, the court should review the interpretation ultimately derived from its examination of the language, context and other indicia of intent for consistency with federal labor policy.

*Id.* at 1479–1480 (citations omitted). As the *Yard–Man* court further advised, courts should look to extrinsic evidence to determine the parties' intent only when the terms of the contract are ambiguous. *Id.* at 1480.

Considering the context in which the benefits at issue arose in *Yard–Man*, the Sixth Circuit went on to note that since benefits for retirees are only permissive rather than mandatory subjects of collective bargaining, "it is unlikely that such

benefits, which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations." *Id.* at 1482 (citations omitted). Thus, the court noted, there is an inference that retiree benefits will vest:

> [R]etiree benefits are in a sense 'status' benefits which, as such, carry with them an inference that they continue so long as the prerequisite status is maintained. Thus, when the parties contract for benefits which accrue upon achievement of retiree status, there is an inference that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree.

*Id.* While other circuits have rejected this inference, the Sixth Circuit continues to rely upon it to interpret CBAs. *See, e.g., Maurer*, 212 F.3d at 915; *see also, Golden v. Kelsey–Hayes Co.*, 73 F.3d at 656 (concluding that *Yard–Man* is still good law). The *Maurer* court noted, however, that "although there is an inference that the parties to a CBA intended for retiree benefits to vest, the burden of proof does not shift to the employer, and it is not required that specific anti-vesting language be used before a court can find that the parties did not intend benefits to vest." *Maurer*, 212 F.3d at 915 (citing *UAW v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir.1999)).

### B. Analysis [13]

■ The Group Insurance Plans provide that employees retiring under Case's pension plan and surviving spouses eligible to receive a spouse's pension under that plan are eligible for group health insurance benefits. This express language is similar to the following language in the insurance agreement considered in *Golden v. Kelsey–Hayes Company:* "The Company shall contribute the full premium or subscription charge for health care ... coverage ... for ... a retired employee and his eligible dependents *provided such retired employee is eligible for benefits under Article II of the ... Pension Plan".* 954 F.Supp. 1173, 1186 (E.D.Mich.1997). The CBA considered in that case contained a similar provision stating that "The Company will pay the full cost of hospital and medical expense coverage of currently enrolled pensioners ... provided the pensioner is eligible for benefits under the Gunite Pension Plan." *Id.* The district court, determining that these provisions conferred vested benefits upon the retirees, held "that eligibility for retiree health benefits is tied to eligibility for lifetime pension benefits or survivor spouse income." *Golden v. Kelsey–Hayes Co.*, 845 F.Supp. 410, 415 (E.D.Mich.1994), *aff'd* 73 F.3d 648 (6th Cir.1996). The court reasoned that since retirees are eligible to receive pension benefits for life, it therefore appears that the parties intended the employer to provide lifetime health benefits as well.

Further supporting a finding that the parties in this case intended retiree health care benefits to vest, is the fact that the Group Insurance Plans contain no express limitations on the duration of such benefits. In comparison, the plans do set forth express limitations on the duration that other categories of employees are entitled to such benefits. For example, active em-

---

**13.** The Shutdown Agreements and Early Retirement Incentive Program provide retirees and their surviving spouses with those health care benefits set forth in the Group Insurance Plans then in effect. *See, e.g.,* Case Exhibits, Vol. III, Ex. 21 at CASELLC00244; Pls.' Exhibits, Vol. III, Ex. U at CASELLC02140.

Thus the Court's analysis as to whether Plaintiffs who retired pursuant to Central Agreements and Group Insurance Plans are entitled to vested health care benefits, applies equally to Plaintiffs who retired under these special programs.

ployees on lay-off or on leave are entitled to continued group insurance benefits according to a specific schedule. *See, e.g., id.,* 1990 Plan at 40–41. Employees on maternity leave are entitled to benefits for up to 12 months following the date their leave of absence commenced. *See id.* As the *Yard–Man* court held, "the inclusion of specific durational limitations in other provisions ... suggests that retiree benefits, not so specifically limited, were intended to survive ..." *Yard–Man,* 716 F.2d at 1481–82; *see also Kelsey–Hayes,* 954 F.Supp. at 1187.

Defendants contend that the express language of the Central Agreements and Summary Plan Descriptions indicate that Plaintiffs' health care benefits did not vest. Defendants focus on the durational clause within the Central Agreements which states that the Group Insurance Plans will run concurrently with the Central Agreements. Relying on this Court's previous decision in *Bittinger v. Tecumseh Prods. Co.,* 83 F.Supp.2d 851 (E.D.Mich.1998), and the District Court for the Northern District of Ohio's unpublished decision in *UAW v. Cleveland Gear Corp.,* 1983 WL 2174 (October 20, 1983), Defendants argue that this provision demonstrates that the UAW and Case intended *all* group insurance benefits to cease when the Central Agreements terminated.

A number of courts have held that such general durational provisions only refer to the length of the agreements and not the period of time contemplated for retiree benefits. *Kelsey–Hayes,* 845 F.Supp. at 414. Absent specific limitations on the duration of particular benefits, the courts have held that such provisions say nothing about the duration of those benefits. *Id; see also Yard–Man,* 716 F.2d at 1482. Furthermore, the labor agreements in *Bit-*

*tinger* and *Cleveland Gear,* are distinguishable from those in the present matter.

In *Cleveland Gear,* the parties' CBA contained a provision limiting the duration of their insurance agreement and insurance plan to the CBA's term. *Cleveland Gear,* 1983 WL 2174, *2. The parties' insurance agreement and insurance plan, however, also contained durational clauses, providing that those agreements continued "until discontinued or superseded either in whole or in the termination or suspension of such Collective Bargaining Agreement ..." *Id.* at *3. The court found the three agreements "totally void of any language from which an intent to create lifelong insurance benefits [could] be inferred." *Id.* In comparison, the agreements at issue here expressly contain such language that is, the GIPs tie retirees' and surviving spouses' eligibility for health care coverage to their eligibility to receive a pension.

For the same reason, *Bittinger* is distinguishable as this Court specifically found in that case that the labor agreement lacked any language linking retiree and surviving spouse eligibility for health care coverage to pension benefits. *Id.* at 862. Defendants contend that *Bittinger* nevertheless is controlling because the insurance plan in that case, like the Summary Plan Descriptions ("SPDs") at issue here, contained provisions in which the employer reserved the right to change the terms of the group insurance plan.[14] In *Bittinger,* the health care plan reserved to the employer the "absolute right, through the collective bargaining process, to amend, modify, or discontinue any or all of the benefits described in the [labor agreement] or the [health care plan] ..." *Bittinger,* 83 F.Supp.2d at 858. Here, the SPDs outlining the Group Insurance Plans between

---

14. The Sixth Circuit has held that "statements in a summary plan are binding and if the statements conflict with those in the plan itself, the summary shall govern." *Edwards v. State Farm Mut. Auto. Ins. Co.,* 851 F.2d 134, 136 (6th Cir.1988).

1974 and 1980 include the following reservation language:

It is hoped that the Group Policies will be continued indefinitely through the years, but your employer necessarily reserves the right, *subject to the applicable provisions of the Labor Agreement* between the Union and the Company, to terminate or change the Plan in the future.

*See, e.g.,* Case LLC Exs, Vol. II, Ex. 7 at 3. Thus Case's right to modify the Group Insurance Plans is expressly limited to the terms of the Central Agreements.

More importantly, any language reserving to the employer the right to change the plan cannot be considered separately from the entire language of the SPDs. Specifically, the section of the SPDs entitled "Provisions Applicable to Retired Employees" provides that "[t]he insurance outlined below will be provided for you if you retire under the Employer's Pension Plan . . . and will be provided for your dependent spouse if, on or prior to the date of your retirement, you elect that your pension be paid to your spouse *after your death* . . ." *See id.* at 32 (emphasis added). As the triggering event for a surviving spouse's receipt of benefits i.e. the retiree's death may occur after the CBA's termination, this provision suggests that Case's promise could remain outstanding beyond the term of the CBA. If retiree and surviving spouse insurance benefits terminated at the end of the relevant Central Agreement's term, this promise would be illusory for most surviving spouses. This suggests that Case and the UAW intended such benefits to continue indefinitely, despite Case's retention of some right to change the Group Insurance Plan. *Compare Yard–Man,* 716 F.2d at 1481 (finding that company's promise to pay insurance benefits once retirees reach age 65, when they are entitled to retire at 55, would be illusory if retiree insurance benefits terminated at end of the collective bargaining agreement's three year term).

Furthermore, SPDs after 1980 do not contain language expressly reserving to Case the right to terminate or change the plan, but rather include "Cessation of Benefits" provisions stating that coverage will immediately cease if, *inter alia,* the Plan is cancelled in whole or in part. *See* Case LLC Exhibits, Vol. III, Ex. 18 at CASELLC 07393 & 07404. This distinction from earlier SPDs is important because the "Cessation of Benefits" further refer to "the Sections of this booklet entitled 'Retirement' and 'Termination of Coverage.' " *See id.* The "Retirement" section does not contain any "Cessation of Benefits" provision. Rather this section, like the Group Insurance Plan, only ties the continuation of retirement benefits to the retiree's or surviving spouse's eligibility for pension benefits: "Employees who retire under the J.I. Case Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that plan, *will be eligible* for the benefits described in this section." *See id.* at CASELLC07461. As well, this section further provides: "Except where noted, the benefits and maximums under these *continued* coverages *will be the same as those that were in effect on the day preceding your retirement* . . ." *See id.* (emphasis added).[15]

Even if the parties' intent were not clear based on the express language of the various labor agreements, Plaintiffs present substantial extrinsic evidence to demonstrate that the UAW and Case intended to provide retirees and surviving spouses fully funded, lifetime health insurance benefits. Darla Clark, who was employed by Case at its Terre Haute plant from Janu-

**15.** Further on, this section provides that "The cost of this coverage is fully paid by the Employer." *See* Case LLC Exhibits, Vol. III, Ex. 19 at CASELLC07463.

ary 1967 until the plant closed in 1987, met with plant employees applying for retirement. *See* Pls.' Exhibits, Vol. I, Ex. A(6). Ms. Clark states that she told retiring employees "that their medical insurance benefits would continue unchanged for their lifetime, and if an employee's spouse had a survivor pension benefit, the spouse would have the same medical insurance benefits for his or her lifetime." *See id.* ¶ 5.

Ms. Clark also provides a letter C.J. Devine, Case's Director of Benefits & Practices, sent retirees in 1971, outlining the group medical insurance benefits for which retirees and their surviving spouses were eligible. *See id.* Ex. E to Aff. Explaining their health care benefits in a question and answer format, Mr. Devine states that "Retirees and Surviving Spouses, age 65 or older, are not required to pay a premium, either for themselves or any eligible dependent. Instead the coverage shall be fully paid by the Company." *See id.* In regards to whether a retiree's surviving spouse will be able to keep this coverage, Mr. Devine provides: "If you have elected the Spouse's Optional Form of Pension and your spouse will receive a pension as a result, your spouse will be able to keep this coverage *for the remainder of her lifetime.*" *See id.* (emphasis added).

Prior to Case's closing of its Terre Haute plant in 1987, Ms. Clark explained to hourly employees the various benefits to which they would be entitled under the three options in the Plant Shutdown Agreement. In connection with this discussion, Ms. Clark gave employees a "Benefit Information" sheet and a "Disability Pension Worksheet" prepared by Case's Industrial Relations Department in Terre Haute. *See id.* ¶ 9, Ex. A and Ex. D. These documents reflect that hourly employees who choose to retire are entitled to health insurance benefits "continu[ed] un-

changed" "[f]or lifetime." *See id.* Ms. Clark also sent medical insurance cards to employees choosing to retire which contain the words "Lifetime" or "Lifetime Coverage." *See id.* ¶¶ 10 & 11, Ex. C. Ms. Clark's letter accompanying these cards states that the cards "reflect your lifetime coverage." *See id.* Ex. B.

Daryl Moore was the Acting Assistant Labor Relations Manager at Case's Bettendorf facility when the facility closed in 1987. *See* Pls.' Exhibits, Vol. I, Ex. A(27) ¶ 6. Prior to the plant closing, Mr. Moore met with hourly employees at the facility to discuss their options and the benefits provided under these options pursuant to the applicable Shutdown Agreement. According to Mr. Moore, he told "these employees that, in retirement, they would have company paid health care coverage for the rest of their lives and, if they had a spouse who survived them, the spouse would also have fully paid health care coverage for his or her life or until their remarriage." *See id.* ¶ 7. Mr. Moore had the same responsibilities and made the same representations to employees at Case's Rock Island plant prior to its closure in 1987.

Plaintiffs also present through the affidavit of Paula Castillo, the surviving spouse of former Case employee Jose Castillo, a summary of retirement benefits that Case provided Mr. Castillo prior to his retirement. *See* Pls.' Exhibits, Vol. I., Ex. A(5). This summary states that Mr. Castillo and his wife are entitled to full health insurance coverage and that if he pre-deceased his wife, her coverage "would continue as before" and only would terminate if she remarried. *See id.,* Att. Under a section entitled "Spouse's Benefits," the summary Mr. Castillo received further provides: "In the event that you should die before your spouse and a spouse's option was spplied [sic] for, she will receive 55% of your pension for her lifetime along

with the insurance which was mentioned previously." According to Ms. Castillo, when she accompanied Mr. Castillo to Case's benefit office prior to his retirement in order to present evidence of their marriage, a benefits representative confirmed that she would be entitled to the benefits set forth in the summary. *See id.,* ¶ 6.

Plaintiffs present affidavits of numerous other retirees and surviving spouses who state that benefit representatives told them that they would receive post-retirement lifetime health insurance coverage, fully paid for by the company. *See,* Pls.' Exhibits, Vol. I, Ex. A. Some of these affiants provide documentation they or their spouse (where the affiant is a surviving spouse) received from Case. In these documents, Case specifically promises retirees and their surviving spouses fully funded health insurance coverage for their lifetime. *See, e.g., id.,* Exhibits A(17), (20), (25), (26), and (32).

Plaintiffs also provide a transcript of a meeting Karen Hamilton, Case's Benefits Coordinator, held at the company's Racine Plant in 1991 for employees considering the Early Retirement Incentive Program. *See,* Pls.' Exhibits, Vol. I, Ex B. During her presentation, Ms. Hamilton told employees that if they opted into the program, they would "retain all the same group insurance that you have right now if you're retiring with 10 years of service or more." *See id.* at 17. One attendee asked Ms. Hamilton "what happens to the spouse's medical insurance if the retiree passes away?" *See id.* at 25. Ms. Hamilton responded, "As long as the spouse is receiving a pension check, the spouse is entitled to group insurance coverage unless they remarry." *See id.*

Defendants present other extrinsic evidence to show that Case and the UAW did not intend to create specific lifetime health insurance benefits for retirees and their surviving spouses. Specifically, Defendants refer to the FAS–106 Letter, arguing that the UAW's willingness to agree to the cap is "powerful evidence" that it did not believe that Case was obligated to provide fully funded health insurance for the lifetime of its retirees. Defendants also note that during the negotiations between Case and the UAW with respect to the letter, the UAW requested that retiree health insurance benefits be described as "lifetime" benefits, thereby suggesting that there was no previous agreement for such benefits to vest. *See* El Paso App., Vol. II, Ex. 14(F).

Defendants also refer to the following language in the VEBA Agreement between Case LLC and the UAW:

> WHEREAS, El Paso's liability to pay medical benefits to Pre–IPO retirees and their dependents and Surviving Spouses and their dependents is limited according to a formula calculated annually based upon the per capita cost of El Paso's medical plan for Pre–IPO Retirees and Surviving Spouses . . .

*See* El Paso App., Vol. III, Ex. 40 at UAW1468. Defendants argue that the UAW's willingness to include this language in the agreement demonstrates that it recognized in 1998 that retiree health insurance benefits were terminable and mutable. Finally, Defendants present the testimony of Case's chief union negotiator, Paul Crist, and its former Director of Employee Benefits, Tim Haas, who state that it was the company's understanding that retiree health care benefits lasted only as long as the Central Agreement in effect and thus were not fixed or perpetual. *See* Crist Dep. at 17; Haas Dep.[16]

---

**16.** Defendants also refer to a December 1971 letter Mr. Devine sent to retirees in which he indicates that some surviving spouses will have to pay premiums to obtain health insur-

The Court does not believe that the UAW's and Case's intent when they executed the Central Agreements and Group Insurance Plans from 1971 through 1990 is made clearer by language in agreements executed several years later by the UAW and Case LLC, particularly as Case's representations to its employees prior to 1998 reflect a different intent. Furthermore, the UAW's intent in 1998 is irrelevant if it lacked the authority to reduce health care benefits for already retired employees and their surviving spouses. The Supreme Court has made clear that unions cannot negotiate reductions in retirees' vested benefits without the retirees' consent. *See Chem. Workers v. Pittsburgh Plate Glass Co.*, 404 U.S. 157, 181 n. 20, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971); *see also, Maurer*, 212 F.3d at 918.

In this Court's opinion, the UAW's request to add "lifetime" language to the FAS–106 Letter does not necessarily mean that the union's representatives believed that the earlier agreements did not provide vested health care benefits. The representatives may have been attempting to more clearly state what they believed earlier agreements provided, particularly where the "agreement" at issue established other limitations on those benefits. Finally, neither Mr. Crist's nor Mr. Haas' testimony is entitled to considerable weight. Mr. Crist is still employed by

Case LLC. Mr. Haas serves as a consultant to Case LLC, receiving $20,000 per month in consulting fees from the company.

For the reasons set forth above, the Court finds based on the evidence presently before it that Plaintiffs are likely to succeed on the merits. Plaintiffs, therefore, have met the first requirement for a preliminary injunction.

### V. *Whether Plaintiffs Will Suffer Irreparable Harm Without the Injunction*

Plaintiffs present affidavits from numerous retirees and surviving spouses, most of whom are living on limited, fixed incomes. These affiants state that they lack the funds to contribute $501 per month to retain their health care coverage.[17] Many of these retirees and surviving spouses suffer serious health care problems and are required to take a number of expensive prescription drugs. Already having lost their health care benefits, some retirees and surviving spouses, such as Edward Ewell, state that they have stopped taking some of their medications, as they cannot afford them. One surviving spouse, Evelyn Corey, has been breaking her prescription pills in half to stretch her supply. Other retirees and surviving spouses have limited their visits

---

ance coverage. *See* Case App., Vol. IV, Ex. 50. Mr. Devine in fact does state that some retirees and surviving spouses, those under age 65, will have to pay a premium; however, this is due to the fact that the Central Agreements prior to 1974 only provided full coverage for retirees over age 65. Starting in 1974, Case agreed to pay the entire cost of health care benefits for employees who retired, regardless of their age. Defendants also claim that Case and the UAW agreed to modify health insurance benefits for retirees over the years. Defendants fail to point to any decrease in benefits for retirees; however, there was an increase in their co-payment

for brand name prescriptions. Courts have found retiree health care benefits vested despite evidence of such changes. *See Helwig v. Kelsey–Hayes*, 857 F.Supp. 1168, 1174 n. 2 (E.D.Mich.1994); *Schalk v. Teledyne, Inc.*, 751 F.Supp. 1261, 1266–67 (W.D.Mich.1990).

**17.** The UAW is paying to continue health care benefits for a handful of retirees and surviving spouses where the retirees were UAW employees when (or in some cases after) they retired from Case. The Court does not find that these exceptions negate an overall showing of irreparable harm.

to their doctors or have been unable to undergo treatment.

El Paso acknowledges that some Plaintiffs are being harmed, perhaps irreparably. Citing *Adams v. Freedom Forge Corp.*, 204 F.3d 475 (3d. Cir.2000), however, El Paso argues that such a showing is insufficient to demonstrate class-wide irreparable harm. In *Adams,* the Third Circuit vacated a preliminary injunction granted by the district court because only 11 of the approximately 136 plaintiffs (retirees and surviving spouses) set forth evidence to establish that they were threatened with irreparable harm when their former employer proposed a modification of their health care coverage. Under the employer's proposal in *Adams,* retirees under age 65 would be switched to new coverage and would be required to pay a portion of their premiums (ranging from $30 to $90). Retirees over age 65 would be able to choose between two different plans: (1) a plan with no premium payments, but a $10 co-payment per prescription and a $1250 annual limit for drug prescriptions or (2) a plan with monthly premiums ranging from $20 to $40, a $10 to $20 co-payment per 30–day supply of prescription drugs, and drug benefits limited to $2500 per year.

The present matter is distinguishable from *Adams* in that Plaintiffs are required to contribute *$501 per month* to maintain *any* of their retiree health care benefits. While Plaintiffs only present the affidavits of 34 retirees and surviving spouses, the Court can surmise that the putative class members overall cannot afford to contribute such an amount until this case is resolved. Unable to afford the $501 premium, Plaintiffs will lose their health care insurance, will not be able to pay for necessary prescription medications, and will not receive all the medical care they need. Reimbursing Plaintiffs for their contributions at the end of the case, therefore, will not afford them relief.

Defendants also argue that Plaintiffs' delay in seeking injunctive relief negates their claim of irreparable harm. While El Paso initially informed retirees and surviving spouses that they would need to pay a premium to maintain their health care coverage in late 1997, Case immediately sent a letter to retirees and surviving spouses indicating that it would pay their premium through 1998.[18] El Paso only informed retirees and surviving spouses in August 2002 that the VEBA Trust had been exhausted and they now would be required to contribute $290 per month. At that time, Plaintiffs and the UAW initiated a lawsuit; however, Plaintiffs and the UAW voluntarily dismissed that suit before an answer was filed when the UAW determined that it should not be named as a plaintiff due to a conflict of interest. In December 2002, El Paso notified retirees and surviving spouses that their contribution was being increased to $501 per month starting January 2003. Plaintiffs immediately filed this lawsuit and, three months later, filed their motion for preliminary injunction. Under these circumstances, Plaintiffs' delay does not negate a showing of irreparable harm, particularly given the information Plaintiffs needed to gather in order to file their motion.

## VI. *Whether Granting the Injunction Will Cause Substantial Harm to Others*

 Defendants maintain that they will be irreparably harmed if they are required to pay the full cost of health care benefits for the putative class, consisting of

**18.** The contribution El Paso first requested from retirees and surviving spouses additionally was minimal.

3700 members based on Plaintiffs' estimate, during the pendency of this lawsuit. The Court recognizes that if Defendants are ultimately successful, they will have suffered substantial damage as a result of the preliminary injunction. However, the Court must balance this potential harm against the potential harm to Plaintiffs if the preliminary injunction is not granted. Defendants have paid the full costs of health care benefits for retirees and their surviving spouses for years prior to August 2002, and in this Court's opinion, the financial impact on Defendants being required to continue to pay these benefits is far less than the financial burden which would be placed on Plaintiffs if their request for a preliminary injunction is denied.

## VII. The Impact of the Injunction on the Public Interest

ERISA provides a policy "to protect the interests of participants in employee benefit plans ... by providing for appropriate remedies, sanctions, and ready access to the Federal Court." 29 U.S.C. § 1001(b). The LMRA favors enforcement of CBAs so as to protect the contractual rights of employees and employers. Plaintiffs contend that the public interest favors issuance of an injunction as ERISA and the LMRA strongly favor the protection of rights guaranteed employees by welfare benefit plans that are part of CBAs. Defendants argue that issuance of a preliminary injunction will thwart the public interest in enforcing the terms of CBAs, as they argue that Plaintiffs only can prevail by evading the terms of their CBAs. As the Court concludes that the terms of the relevant labor agreements entitle Plaintiffs to fully funded, lifetime health care benefits, Defendants' argument fails and the Court finds that the public interest will be served by the issuance of an injunction.

## VIII. Breadth of the Court's Injunction

Defendants argue that Plaintiffs' request for an injunction is overbroad, as health care benefit levels for retirees and their surviving spouses varied under the Central Agreements. Effective with the 1971 Central Agreement, however, retirees over age 65 have not been required to pay any premium for their retiree health care coverage. The only change over the years in retiree insurance benefits has been the expansion of coverage for example, the inclusion of vision care coverage and the addition of a hearing aid plan. Plaintiffs merely ask the Court to require Defendants to pay the full cost of the health care benefits they were previously receiving. Defendants only will be required to continue or resume providing the same insurance coverage to Plaintiffs that they were entitled to receive before El Paso required a premium.

Defendants also argue that an injunction should not extend to those employees who retired after October 3, 1993, the date the FAS–106 Letter became effective and thus arguably capped Case's retiree health insurance obligations. At this time, the Court is not convinced that the FAS–106 Letter was merely for accounting purposes and that the UAW and Case therefore did not intend for it to limit Case's obligations to provide future retirees' health care benefits. Thus employees who elected to retire after that date are not entitled to a preliminary injunction. However the Court finds this alleged "cap" ineffective with respect to employees who chose to retire prior to October 3, even if their retirement went into effect after that date, and with respect to employees who elected a Voluntary Lay–Off option prior to the FAS–106 Letter's effective date, but who only "grew into" retirement after that date.

■ Finally, Defendants contend that those employees who retired pursuant to Shutdown Agreements or Early Retirement Incentive Programs signed release documents barring them from filing claims against Defendants for any benefits. *See, e.g.*, Pls.' Exhibits, Vol. III, Ex. U at CA-SELLC 02143; Case LLC's Exhibits, Vol. III, Ex. 22 at EM00764. The releases expressly state, however, that the retirees retained the right to bring any claims arising from those agreements.[19]

## IX. *Whether El Paso and/or Case LLC is Liable for Plaintiffs' Health Insurance Benefits*

■ Case LLC has filed a cross-claim against El Paso for breach of contract, contending that El Paso, as Tenneco's successor, is solely responsible for the cost of Plaintiffs' health care benefits. In its Response to Plaintiffs' motion for preliminary injunction, El Paso argues that it assumed liability for pre-IPO retiree health care subject to negotiated limits specifically the cap set forth in the FAS–106 Letter. According to El Paso, Case retained liability for retiree health care costs above the cap, the costs at issue in this lawsuit.

Having reviewed the Reorganization Agreement and the Benefits Agreement, the Court finds that El Paso, as Tenneco's successor, is primarily liable for the entire health care costs for pre-IPO retirees and their surviving spouses. Article III, Section 3.02(c) of the Reorganization Agreement and Section 7.2.2 of the Benefits Agreement provide that Tenneco assumes, with certain limitations, the "Retained Lia-

bilities," which specifically are defined to include Case's liabilities for post-retirement health insurance benefits for pre-IPO retirees and their dependents. Contrary to El Paso's claim, nothing in either agreement limits Tenneco's liability for retiree health insurance benefits to the costs below the alleged cap established in the FAS–106 Letter. Section 7.2.4 limits Tenneco's liability for any costs resulting from any action of Case Equipment *after* the date of the Benefits Agreement. As the section further provides as an example, any increase in the cost of benefits that result from any agreement by Case Equipment "to *increase or otherwise modify the per capita annual cost limits* set forth in [the FAS–106 Letter]." The costs of pre-IPO retirees' and surviving spouses' fully funded health care benefits have not arisen as a result of any action by Case Equipment *after* the Reorganization and Benefits Agreements were executed.

■ Case, however, has not been released from its liability to provide fully funded, lifetime health insurance benefits to its retirees and their surviving spouses. Thus despite Tenneco's assumption of this liability, Case remains responsible to Plaintiffs for the cost of these benefits. Case LLC argues that it is a distinct corporation from Case and therefore is not liable for these costs. At this time, the Court cannot determine whether the two corporations are in fact distinct or whether the 1994 reorganization merely left Case as a shell corporation and shifted its busi-

---

19. For example, the Waiver and Release executed by employees retiring pursuant to the 1993 Shutdown Agreement provides:

In consideration of said sums and other benefits in this Shutdown Agreement, the undersigned hereby waives, releases, and forever discharges the Company and/or the Union from any and all obligations, claims, causes of action, liabilities, grievance or

arbitration claims ... arising out of or related to facts or events occurring prior to the execution of this waiver and release regarding the employment relationship ... *except those claims which are based on alleged violations of this Shutdown Agreement* ...

*See* Case LLC's Exhibits, Vol. III, Ex. 22 at EM00764–EM00765.

ness to a "new" company with a temporarily different name.

The Court therefore concludes that El Paso is liable for the full costs of the pre-IPO retirees' and surviving spouses' health insurance benefits. The Court may subsequently conclude that Case LLC also is liable for these costs.[20]

## X. Defendants' Request for a Security Bond

Rule 65(c) of the Federal Rules of Civil Procedures provides:

> No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper, for the payment of such costs and damages as may be incurred or suffered by any party who is found to have been wrongfully enjoined or restrained.

FED. R. CIV. P. 65(c). It is within the Court's discretion to determine the amount of security to be given by Plaintiff for an injunction. *USACO Coal Co. v. Carbomin Energy, Inc.*, 689 F.2d 94, 100 (6th Cir. 1982). However the Court may require no security at all, as the Sixth Circuit, unlike several other circuits, holds that the requirement of Rule 65(c) is not mandatory. *Roth v. Bank of Commonwealth*, 583 F.2d 527, 538 (6th Cir.1978)(citing *Urbain v. Knapp Bros. Manuf. Co.*, 217 F.2d 810 (6th Cir.1954)). As the *Roth* court held "... it was error for the judge, not necessarily to have failed to require a bond in any particular amount, but to have failed to exercise the discretion required of him by Rule 65(c) by expressly considering the question of requiring a bond." *Id.*

In considering whether to require a plaintiff to give security and, if so, the amount of that security, the Court must balance the interests of the plaintiff

and the defendant. As the Sixth Circuit explained in *USACO Coal*, "[t]he purpose of a security deposit ... is to protect the party injured from damage occasioned by the injunction." *Id.* That purpose, however, must be weighed against the hardship that a bond would impose upon the plaintiff and the diminishing impact such a requirement would have on the relief obtained. Balancing those interests, some courts have required a nominal bond; however, it is this Court's view that a nominal bond is merely a formality which will not provide any meaningful protection to El Paso for the costs and damages occasioned by the preliminary injunction.

Defendants claim that paying fully funded health care benefits for pre-IPO retirees and their surviving spouses will cost in excess of $1.8 million per month. Thus Defendants seek a bond of at least $6 million. Plaintiffs ask the Court to impose a "modest bond," as the district courts required in such similar cases as *Schalk v. Teledyne, Inc.*, 751 F.Supp. 1261, 1269 (W.D.Mich.1990)(requiring $50,000 bond, although defendant claimed monthly cost of retiree insurance benefits to be $90,000), *Golden v. Kelsey–Hayes Co.*, 845 F.Supp. 410, 416–17 (E.D.Mich.1994)(requiring $100,000 bond despite defendant's estimated cost of $160,000 per month to provide retiree insurance benefits), and *Helwig v. Kelsey–Hayes Co.*, 857 F.Supp. 1168, 1181 (E.D.Mich.1994)(requiring $95,000 bond where defendant claimed monthly cost of $150,000 to provide retiree insurance benefits). *See also Hinckley v. Kelsey–Hayes Co.*, 866 F.Supp. 1034, 1046 (E.D.Mich.1994)(imposing bond of $55,000, although defendant estimated insurance benefits for retirees to cost $87,000 per month); *Fox v. Massey–Ferguson, Inc.*,

---

**20.** Article V of the Reorganization Agreement contains an indemnification provision, requiring either defendant to indemnify the other defendant for failure to comply with its obligations under the agreement.

**476**

172 F.R.D. 653, 681 (E.D.Mich.1995)(imposing bond of $95,000, although monthly insurance benefits claimed to cost $150,000).

Clearly Plaintiffs and members of the putative class are incapable of providing security in an amount close to either of the figures Defendants cite. As their affidavits indicate, a great number of these individuals depend upon their pension benefits and/or payments from Social Security as their sole source of income. Thus the Court finds that Plaintiffs lack any meaningful funds to post a substantial bond.[21] The Court, however, believes that something more than a "nominal" bond should be required as a condition of Plaintiffs obtaining this injunction because of the cost to Defendants if Defendants ultimately prevail. Therefore, the Court shall order Plaintiffs to post a bond in the amount of $50,000 as a condition of obtaining the preliminary injunctive relief they seek.

An Order consistent with this Opinion shall issue.

### ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs brought this lawsuit on behalf of retirees and surviving spouses of retirees, seeking fully funded, lifetime health care benefits from Defendants. Plaintiffs filed a motion for preliminary injunction on March 21, 2003. For the reasons set forth in an Order issued this date,

IT IS ORDERED, that Plaintiffs' motion for preliminary injunction is GRANTED;

IT IS FURTHER ORDERED, that upon the posting of a $50,000 security bond by Plaintiffs, Defendant El Paso Tennessee Pipeline Company shall resume

paying the full costs of health insurance benefits for retirees and surviving spouses of retirees who retired from Case prior to October 3, 1993.

This Order shall remain in effect until further of this Court.

---

**21.** If Defendants can identify a source of funds available to Plaintiffs to post a larger bond, they may request a "bond hearing." However such request will not delay the effective date of this preliminary injunction. The preliminary injunction is effective upon Plaintiffs' posting of the required bond.