*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0019p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

GLADYS YOLTON, WILBUR MONTGOMERY, ELSIE
TEAS, ROBERT BETKER, EDWARD MAYNARD, and
GARY HALSTED, on behalf of themselves and a
similarly situated class,

*Plaintiffs-Appellees,*

*v.*

EL PASO TENNESSEE PIPELINE CO.,

*Defendant-Appellant
(04-1821/2492),*

CASE CORPORATION, now known as CNH AMERICA,
LLC,

*Defendant-Appellant
(04-1182/1818).*

Nos. 04-1182/1818/1821/2492

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 02-75164—Patrick J. Duggan, District Judge.

Argued: December 6, 2005

Decided and Filed: January 17, 2006

Before: MARTIN, COLE, and GILMAN, Circuit Judges.

---

## COUNSEL

**ARGUED:** Bobby R. Burchfield, McDERMOTT, WILL & EMERY, Washington, D.C., Stephanie
J. Goldstein, FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, for
Defendants. Roger J. McClow, KLIMIST, McKNIGHT, SALE, McCLOW & CANZANO,
Southfield, Michigan, for Plaintiffs. **ON BRIEF:** Bobby R. Burchfield, Jason A. Levine, Douglas
G. Edelschick, McDERMOTT, WILL & EMERY, Washington, D.C., Stephanie J. Goldstein,
FRIED, FRANK, HARRIS, SHRIVER & JACOBSON, New York, New York, Thomas G.
Kienbaum, Noel D. Massie, William B. Forrest III, KIENBAUM, OPPERWALL, HARDY &
PELTON, Birmingham, Michigan, Norman C. Ankers, HONIGAN, MILLER, SCHWARTZ, AND
COHN, Detroit, Michigan, for Defendants. Roger J. McClow, Samuel C. McKnight, KLIMIST,
McKNIGHT, SALE, McCLOW & CANZANO, Southfield, Michigan, for Plaintiffs.

1

—————————

## OPINION

—————————

BOYCE F. MARTIN, JR., Circuit Judge.  The plaintiffs in these four consolidated appeals are retirees or surviving spouses of the J.I. Case Company or the Case Corporation, and they seek fully funded lifetime retiree health care benefits from the defendants.  The district court found that the plaintiffs demonstrated a likelihood of success on the merits and entered a preliminary injunction requiring the continued payment of the health care benefits.  In three of the consolidated appeals, the underlying issue is whether the retirement health care benefits vested for life.  We conclude that the district court did not abuse its discretion in determining that the plaintiffs are likely to succeed on their claim that their health care benefits are fully vested for life.  So concluding, we turn to the question presented in the fourth consolidated appeal, and hold that the district court correctly determined that the contract between El Paso and CNH America unambiguously allocates the full cost of those benefits to El Paso.  We therefore AFFIRM the district court's judgment in all respects.

### I.

In their complaint, the plaintiffs alleged two counts against the defendants: (1) breach of labor agreements in violation of Section 301 of the Labor Management Relations Act, 29 U.S.C. § 185,[1] by requiring the plaintiffs to contribute premiums to maintain their retiree or surviving spouse health care benefits, and (2) breach of fiduciary duties under the various labor agreements which constitute employee welfare plans within the meaning of the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq*.

The defendants are El Paso Tennessee Pipeline Company and CNH America, LLC.  JI Case, not a party to the dispute, was established in 1842 and became a wholly owned subsidiary of Tenneco (now El Paso) in 1970.  JI Case remained a wholly owned subsidiary of Tenneco until 1994 when Tenneco underwent a reorganization and decided to spin off its own and JI Case's agriculture and construction business assets.  Tenneco therefore formed a new corporation, Case Equipment Corporation, and pursuant to a Reorganization Agreement, transferred these assets to Case Equipment.  Included was all of the JI Case business (defined as the farm and construction equipment business of Tenneco) except for Tenneco's JI Case stock, certain demand notes and subordinated debt, as well as the Retained Assets and Retained Liabilities.  Case Equipment was then spun off on July 1, 1994, in an initial public offering of its shares.  Case Equipment then changed its name to Case Corporation, then to Case, LLC, and is now known as CNH America.[2] In 1996, Tenneco merged with a subsidiary of El Paso Natural Gas Company and is now known as El Paso Tennessee Pipeline Company.

The International Union, United Automobile, Aerospace and Agricultural Workers of America (UAW) represented JI Case employees in collective bargaining.  Over the years, UAW and JI Case negotiated a number of collective bargaining agreements (CBAs).  UAW and JI Case also negotiated a series of Group Insurance Plans which addressed group insurance benefits for various categories of employees and former employees.  The CBAs between UAW and JI Case from 1971

———————————

[1]Section 301(a) states that: "Suits for violation of contracts between an employer and a labor organization representing employees in an industry affecting commerce as defined in this chapter, or between any such labor organizations, may be brought in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties."  29 U.S.C. § 185(a).

[2]For ease of discussion, at times the opinion will refer to CNH America by its previous names.

forward contain the following language in Section 4A with respect to the Group Insurance Plans: "The group insurance plan agreed to between the parties will run concurrently with this Agreement and is hereby made a part of this Agreement." In Section 4C the CBA states: "The pension plan agreed to between the parties will run concurrently with this Agreement and is hereby made part of this Agreement." In 1974, JI Case agreed to pay the full cost of health care benefits for retirees and eligible surviving spouses regardless of age. Under the section "Contribution for Coverage," the plan states that "the Company shall pay the full premium cost of the above coverages." The language of the Group Insurance Plans remained substantially unchanged through 1990.

Over the years, Metropolitan Life Insurance Company prepared benefit booklets describing insurance benefits provided under the Group Policy contracts between JI Case and Metropolitan. These booklets included language that "it is hoped that the Group Policies will be continued indefinitely through the years, but your employer necessarily reserves the right, subject to the applicable provisions of the Labor Agreement [CBAs], to terminate or change the Plan in the future."

The 1990 Agreement is the CBA under which the plaintiffs retired. The 1990 CBA was effective from June 2, 1990 through October 2, 1993. On November 5, 1993, however, JI Case and UAW entered into an Extension Agreement that extended the 1990 CBA through February 2, 1995. In Section 9 of the Extension Agreement, JI Case and UAW agreed to adopt, effective on October 3, 1993, a Letter of Agreement ("the FAS-106 Letter") that appears to cap JI Case's liability for certain health care benefits. The Letter states:

> This will confirm our understanding that the average per capita annual cost to the Company of providing medical and related benefits under the Case Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed $2,750 for Medicare eligible individuals and $8,500 for those individuals who are not eligible for Medicare. Notwithstanding the foregoing, no covered person shall be required to pay a portion of any excess amount prior to April 1, 1998.

The parties dispute the effect of this letter.[3]

On June 23, 1994, pursuant to Tenneco's transfer of its and Case's farm and construction equipment assets to Case Equipment, Tenneco, JI Case, and Case Equipment signed a number of agreements, including a Reorganization Agreement and an Employee Benefits and Compensation Allocation Agreement. As part of the agreement, Tenneco assumed "Retained Liabilities" and agreed to "pay, perform and discharge in due course all of the Retained Liabilities." The agreement defines "Retained Liabilities" as: "[T]he Case Liabilities for postretirement health and life insurance benefits (to the extent that Case is obligated on the Reorganization Date [June 23, 1994]) of retirees of the Case Business in the United States and current employees of the Case Business in the United States who retire on or before July 1, 1994 and their dependents as more fully described in the benefits agreement." Tenneco further agreed to indemnify Case Equipment "from and against any and all Liabilities, and any claims, demands and rights of the [Case Equipment] Indemnitees arising out of or due to . . . the failure or alleged failure of Tenneco or any Tenneco subsidiary to pay . . . any of the Retained Liabilities . . . ."

---

[3]The defendants contend that JI Case and UAW intended the Letter to be a "cost sharing agreement" between JI Case and its retirees whereby JI Case's obligations for retiree and surviving spouse health care benefits would be limited, effective April 1, 1998. The plaintiffs, on the other hand, contend that the parties intended the Letter to serve only as an accommodation for accounting purposes under FAS-106, whereby UAW agreed to allow JI Case to temporarily reduce the FAS-106 accounting figure that it reported on its financial records.

Section 7.2.2 of the agreement further provides that Tenneco will "retain all liability with respect to postretirement health and life insurance benefits to the extent that Case is obligated on the Closing Date for United States employees retired prior to the Closing Date and their Dependants." Section 7.4 provides a limitation on Tenneco's responsibility:

Tenneco shall not be liable for any postretirement health and life insurance benefit costs which result from any action of [Case Equipment] after the Closing Date which increases such benefits, except to the extent that such benefit increases are required by applicable law. To the extent that Tenneco is not liable for such benefits, [Case Equipment] shall be liable. Without limiting the generality of the foregoing, it is specifically provided that Tenneco shall not be liable for any increase in the cost of providing postretirement health and life insurance benefits that result from any agreement by [Case Equipment] to increase or otherwise modify the per capita annual cost limits set forth in [the FAS-106 Letter].

Case LLC assumed the existing CBAs between JI Case and the UAW.

After the Reorganization, Case LLC continued to operate the same farm and construction business that JI Case had under the same management, at the same locations, with the same equipment, with the same supervision, producing the same products, with the same employees, working under the same CBAs. Tenneco then began paying the full cost of the plaintiffs's health care benefits in 1994. In November 1996 Tenneco sent a letter to its retirees advising them of its impending merger with El Paso and advising those individuals who retired from JI Case that their health care benefits would be maintained by El Paso after the merger. On October 27, 1997, El Paso sent a letter to the plaintiffs informing them that they would be required to contribute $56 per month for health care coverage as of April 1, 1998. El Paso based this requirement on the FAS-106 Letter.

In the meantime and as part of negotiations for a new CBA, UAW asked Case LLC to pay the $56 per month contribution that El Paso sought from pre-IPO retirees for their health care coverage. Case LLC agreed to pay the contributions "as a show of good will toward the UAW," but insisted that it had no legal obligation to pay for the health care benefits. On October 1, 1998, Case LLC and the UAW entered into the Voluntary Employee Beneficiary Association Agreement whereby both Case LLC and UAW agreed "to make deposits of specified amounts in trust to be applied to defray partially the cost of medical benefits in excess of the Cap under El Paso's medical plan for Pre-IPO Retirees and Surviving Spouses . . ."

Case LLC then informed pre-IPO retirees and surviving spouses that it would pay their $56 per month premium through the end of 1998. In the summer of 2002, the funds contributed by UAW and Case LLC were exhausted. UAW asked Case LLC and El Paso to make additional contributions to fund the above-cap health care insurance costs for pre-IPO retirees; they both refused. In August 2002, El Paso sent a letter to pre-IPO retirees informing them that they would need to contribute $290 per month in order to continue receiving retiree health care benefits. In December, El Paso sent another letter to the effect that premiums would increase to $501 per month as of January 2003. The plaintiffs filed this lawsuit on December 23, 2002. Subsequently, in October 2003, El Paso informed retirees that the monthly contribution would increase to $561 as of January 2004.

On December 31, 2003, the district court granted the plaintiffs's motion for a preliminary injunction, concluding that the plaintiffs were likely to succeed on their claim that CNH America was obligated to provide fully paid, lifetime health care benefits. *Yolton v. El Paso Tennessee Pipeline Co.*, 318 F. Supp. 2d 455 (E.D. Mich. 2003). The injunction was limited to those retirees who had retired before October 3, 1993 (the date of the FAS-106 Letter). *Id.* at 473. The district court further concluded that pursuant to the 1994 Reorganization, El Paso (as Tenneco's successor)

had assumed CNH America's obligation to provide the benefits. *Id.* at 474-75. El Paso moved for reconsideration, arguing that it was premature to resolve the issue of the allocation of liability under the Reorganization Agreement. The district court granted El Paso's motion. On March 9, 2004, the district court concluded that CNH America, as the signatory to the CBAs (via Case LLC), had a direct obligation to the retirees. Nevertheless, on September 3, 2004, the district court granted summary judgment to CNH America on its cross-claim against El Paso for indemnification under the Reorganization Agreement for *all* of CNH America's pre-Reorganization retiree health care benefit liabilities. These appeals followed the district court's orders.

## II.

The first issue for our consideration is whether the district court abused its discretion when it concluded that the plaintiffs were likely to succeed on their claim that their retirement health care benefits are vested. We conclude that the district court did not abuse its discretion because the CBAs demonstrate an intent to vest the benefits. Because we conclude that the district court did not abuse its discretion when issuing the injunction, we must determine whether the district court erred in granting CNH America summary judgment on its cross-claim that El Paso is liable for the full cost of the plaintiffs's health care benefits. We conclude that the contract was unambiguous, and the district court correctly granted summary judgment in favor of CNH America.

## III.

### A.     *The Standard of Review is Abuse of Discretion*

This Court reviews a district court's grant of a preliminary injunction for an abuse of discretion. *Tucker v. City of Fairfield*, 398 F.3d 457, 461 (6th Cir. 2005). "A district court abuses its discretion when it relies on clearly erroneous findings of fact, improperly applies the law, or uses an erroneous legal standard." *Id.* This Court reviews the district court's conclusions of law *de novo* and its findings of fact for clear error. *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996). "Questions of contract interpretation are generally considered questions of law subject to *de novo* review." *Id.*

To determine whether to grant a preliminary injunction, a district court must consider: "(1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of an injunction upon the public interest." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson County*, 274 F.3d 377, 400 (6th Cir. 2001). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Golden*, 73 F.3d at 653.

### B.     *The district court did not abuse its discretion in this case.*

The district court considered each of the four factors listed above when issuing the preliminary injunction. The defendants primarily challenge the district court's findings on the first factor — that is, the court's determination that the plaintiffs are likely to succeed on the merits. The plaintiffs are likely to succeed on the merits if they can prove that they have a vested right to the insurance benefits they claim. "To prove this, the plaintiffs must show that the defendant and the union intended to include a right to lifetime benefits when they negotiated the CBAs at issue." *Golden*, 73 F.3d at 653.

A retiree health care insurance benefit plan is a welfare benefit plan under ERISA. *Maurer v. Joy Tech., Inc.*, 212 F.3d 907, 914 (6th Cir. 2000) (citing *Boyer v. Douglas Components Corp.*, 986 F.2d 999, 1005 (6th Cir. 1993)). Unlike pension plans, "[t]here is no statutory right to lifetime

health benefits." *Golden*, 73 F.3d at 653.[4]  If lifetime health care benefits exist for the plaintiffs, it is because the UAW and the defendants agreed to vest a welfare benefit plan. *Id.* at 654; *see also Boyer*, 986 F.2d at 1005.  If a welfare benefit has not vested, "after a CBA expires, an employer generally is free to modify or terminate any retiree medical benefits that the employer provided pursuant to that CBA." *Bittinger v. Tecumseh Prod. Co.*, 83 F. Supp. 2d 851, 857 (E.D. Mich. 1998) (quoting *Am. Fed'n of Grain Millers v. Int'l Multifoods*, 116 F.3d 976, 979 (2d Cir. 1997)).  If a welfare benefit has vested, the employer's unilateral modification or reduction of those benefits constitutes a LMRA violation.  *Maurer*, 212 F.3d at 914.

The district court applied this Court's decision in *UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1479 (6th Cir. 1983), to determine whether the parties intended for the retiree health insurance benefits to vest.  *Yolton*, 318 F. Supp. 2d at 465.  *Yard-Man* recognized that parties to CBAs can agree to vest benefits that survive the termination of the agreement.  *Yard-Man*, 716 F.2d at 1479.  Whether the benefits vest depends upon the intent of the parties.  *Golden*, 73 F.3d at 654.  "Courts can find that rights have vested under a CBA even if the intent to vest has not been explicitly set out in the agreement."  *Maurer v. Joy Technologies, Inc.*, 212 F.3d 907, 915 (6th Cir. 2000).  In *Golden*, the Court clarified that in determining the intent of the parties to a CBA, "basic rules of contract interpretation apply."  *Golden*, 73 F.3d at 654.  Thus, *Yard-Man* makes clear that courts "should first look to the explicit language of the collective bargaining agreement for clear manifestations of intent."  *Yard-Man*, 716 F.2d at 1479.  Moreover, courts "should also interpret each provision in question as part of the integrated whole.  If possible, each provision should be construed consistently with the entire document and the relative positions and purposes of the parties."  *Id.*  When ambiguities exist, courts may look to other provisions of the document and other extrinsic evidence.  *Id.* at 1480; *see also Golden*, 73 F.3d at 654.

Part of the *Yard-Man* decision has generated controversy.  Examining the context of the CBA negotiations, the Court wrote that "it is unlikely that [life and health insurance benefits], which are typically understood as a form of delayed compensation or reward for past services, would be left to the contingencies of future negotiations."  *Yard-Man*, 716 F.2d at 1482.  Thus, "retiree benefits are in a sense 'status' benefits which, as such, carry with them an *inference* that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree."  *Id.* (emphasis added).  This inference has caused much consternation for employers despite the remainder of the Court's opinion:

> This is not to say that retiree insurance benefits are necessarily interminable by their nature.  Nor does any federal labor policy . . . presumptively favor the finding of interminable rights to retiree insurance benefits when the collective bargaining agreement is silent.  Rather, as part of the context from which the collective bargaining agreement arose, the nature of such benefits simply provides another inference of intent.  *Standing alone, this factor would be insufficient to find an intent to create interminable benefits*.  In the present case, however, this contextual factor buttresses *the already sufficient evidence of such intent* in the language of the agreement itself.

*Id.* (emphasis added).  Later cases further clarified the inference.  Shortly after *Yard-Man*, this Court stated that "there is no legal presumption based on the status of retired employees."  *Int'l Union, United Auto. Workers v. Cadillac Malleable Iron Co.*, 728 F.2d 807, 808 (6th Cir. 1984).  Moreover, "*Yard-Man* does not shift the burden of proof to the employer, nor does it require specific anti-

---

[4]ERISA provides for two types of employee benefit plans: pension plans and welfare benefit plans.  29 U.S.C. § 1002(1), (2)(A).  Pension plans are subject to mandatory participation, vesting, and funding requirements.  29 U.S.C. § 1051.  Welfare benefits are not subject to these requirements.  *Id.*  Retiree health insurance benefit plans are classified as welfare benefit plans under ERISA.  29 U.S.C. § 1002(1).

vesting language before a court can find that the parties did not intend benefits to vest. Rather, the *Yard-Man* inference, and the other teachings of the opinion regarding contract interpretation and the consideration of extrinsic evidence, simply guide courts faced with the task of discerning the intent of the parties from vague or ambiguous CBAs." *Golden*, 73 F.3d at 656.

Both El Paso and CNH America devote a great deal of energy to disputing the correctness of the *Yard-Man* inference. El Paso even suggests that this panel should overrule *Yard-Man*.[5] Aside from a panel's lack of authority to do so, these concerns are significantly overstated. El Paso and CNH America misinterpret the term "inference" and confuse it with a legal presumption. Under *Yard-Man* we may *infer* an intent to vest from the context and already sufficient evidence of such intent. Absent such other evidence, we do not start our analysis presuming anything. If *Yard-Man* required a *presumption*, the burden of rebutting that presumption would fall on the defendants. However, under *Yard-Man*, "[t]here is no legal presumption that benefits vest and that the burden of proof rests on plaintiffs." *Maurer*, 212 F.3d at 917. This Court has never inferred an intent to vest benefits in the absence of either explicit contractual language or extrinsic evidence indicating such an intent. Rather, the inference functions more to provide a contextual understanding about the nature of labor-management negotiations over retirement benefits. That is, because retirement health care benefits are not mandatory or required to be included in an agreement, and because they are "typically understood as a form of delayed compensation or reward for past services" it is unlikely that they would be "left to the contingencies of future negotiations." *Yard-Man*, 716 F.2d at 1481-82 (citations omitted). When other contextual factors so indicate, *Yard-Man* simply provides another inference of intent. All that *Yard-Man* and subsequent cases instruct is that the Court should apply ordinary principles of contract interpretation. There is no need to revise, reconsider, or overrule *Yard-Man*.

Furthermore, there is no indication that the district court applied either a presumption or relied unnecessarily on the *Yard-Man* inference. Citing *Yard-Man*, the district court correctly stated that "courts must apply basic rules of contract interpretation to discern the intent of the parties." *Yolton*, 318 F. Supp. 2d at 465. The district court did mention the inference and noted that Sixth Circuit case law has not repudiated the *Yard-Man* language, but the court's analysis does not in any sense *rely* on an inference. *Id.* at 465-68. Instead, the district court interpreted the language of the agreement and found evidence that the defendants intended to confer lifetime benefits upon the plaintiffs. *Id.* at 466. Of particular significance to the district court was language in the Group Insurance Plan that tied benefits to the pension plans — that is, the Group Insurance Plan provided that employees retiring under the pension plan are eligible for the lifetime health care insurance. *Id.* Because the pension plan is a lifetime plan and the health insurance benefits are tied to the pension plan, the district court found that the health insurance benefits were vested and intended to be lifetime benefits. *Id.* at 466-67. This language is similar to *Golden*, where the district court's key finding was the provisions in each of the CBAs that tied retiree benefits and surviving spouse eligibility for health insurance coverage to eligibility for vested pension benefits. "Since retirees are eligible to receive pension benefits for life, the court found that the parties intended that the company provide lifetime health benefits as well." *Golden*, 73 F.3d at 656.

The defendants counter this finding by pointing to the durational clause in the CBA, which states in section 4A that the insurance plan "will run concurrently with [the CBA] and is hereby made part of this Agreement." The defendants argue that this is clear and explicit language that demonstrates that the health insurance benefits were not intended to vest and were only to last as long as the CBA. Thus, every time a CBA expires, the company would be free to modify benefits

---

[5]The defendants also advance the argument that this Court already overruled *Yard-Man* in *Sprague v. General Motors Corp.*, 133 F.3d 388 (6th Cir. 1998) (en banc). Prior panels have already addressed and explicitly rejected this argument. *Maurer*, 212 F.3d at 917 (rejecting claim that *Sprague* overruled *Yard-Man* and further rejecting the claim that explicit vesting language is necessary for welfare benefits to vest).

until another CBA is agreed to.  Stated another way, retiree's health insurance coverage is subject to change every few years based on new bargaining agreements.

The district court did not abuse its discretion in rejecting the defendants's arguments for two reasons.  First, as the district court found, "a number of courts have held that such general durational provisions only refer to the length of the [CBAs] and not the period of time contemplated for retiree benefits." *Yolton*, 318 F. Supp. 2d at 467 (citing *Golden v. Kelsey-Hayes Co.*, 845 F. Supp. 410 (E.D. Mich. 1994)).  Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits. *Id.; see also Yard-Man*, 716 F.2d at 1482; *Schalk v. Teledyne, Inc.*, 751 F. Supp. 1261, 1265 (W.D. Mich. 1990), *aff'd* 948 F.2d 1290 (6th Cir. 1991) ("the existence of a general durational clause which provide[s] that the collective bargaining agreement should remain in effect until a certain date d[oes] not demonstrate an intent that all benefits described in the agreement also terminate[] on that date.").

That reasoning as applied to the agreements before us means that the concurrent language does nothing to those employees who have already retired under the plan.  The durational language only affects *future* retirees — that is, someone who retired after the expiration of a particular CBA would not be entitled to the previous benefits, but is rather entitled only to those benefits newly negotiated under a new CBA.  Thus, the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, but someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself.[6]

Second, section 4C of the CBA states that "The pension plan agreed to between the parties will run concurrently with this agreement and is hereby made part of this Agreement."  The plaintiffs point to this language as strongly supporting their argument that the retirement benefits are vested.  This is because pension benefits are vested benefits.  There is no suggestion that a retiree's pension plan is subject to change under each new CBA.  The plaintiffs assert, therefore, that because pension plans are vested benefits and because the CBA uses the same durational language for pension plans that it uses for the health care benefits, the health care benefits also must be vested benefits.  They argue that the agreements would not use the same language in sections 4A and 4C if it had different meanings.[7]  This argument further bolsters the interpretation noted above that the expiration of a CBA affects only future retirees in the context of benefits.  Reviewing "each provision in question as part of the integrated whole," the use of similar language in sections 4A and 4C provides substantial support for the plaintiffs's position. *Yard-Man*, 716 F.2d at 1479.[8]

---

[6]This is perhaps where the *Yard-Man* inference makes the most sense.  Retirees, who have left their bargaining unit, and can no longer rely on their union to maintain their benefits, are not likely to leave their benefits alterable based on the changing whims and relative bargaining power of their former union and employer. *See Golden*, 845 F. Supp. at 413.

[7]The district court in *Golden* likewise rejected the defendant's argument regarding the durational clauses because the same language was used regarding pensions and health insurance benefits.  The district court stated that "[g]iven the defendant's logic, because its pension plan was incorporated into the collective bargaining agreement, its obligation to provide pensions ended with the expiration of the agreement." *Golden*, 845 F. Supp. at 415 n.1.

[8]The district court in *Golden* characterized *Yard-Man* as "recogniz[ing] that employees are aware when they accept retiree benefits in exchange for lower wages, that they cannot rely on their union to maintain those benefits once they have retired and left their bargaining unit.  Thus, 'finding an intent to create interminable rights to retiree insurance benefits in the absence of explicit language, is not, in any discernible way, inconsistent with federal labor law.'" *Golden*, 845 F. Supp. at 413 (quoting *Yard-Man*, 716 F.2d at 1482).

The district court also cited specific durational limits on other types of benefits in the Group Insurance Plan. The *Yard-Man* court held that "the inclusion of specific durational limitations in other provisions . . . suggests that retiree benefits, not so specifically limited, were intended to survive . . ." *Yard-Man*, 716 F.2d at 1481-82; *see also Kelsey-Hayes*, 954 F. Supp. at 1187. In the plans at issue here, the district court cited the specific durational limitations for workers on lay-off and on maternity leave. *Yolton*, 318 F. Supp. 2d at 466-67.

In response to the defendants's arguments, the district court distinguished the language in this case from the plans at issue in *UAW v. Cleveland Gear Corp.*, 1983 WL 2174 (N.D. Ohio 1983), and *Bittinger v. Tecumseh Products Co.*, 83 F. Supp. 2d 851 (E.D. Mich. 1998), upon which the defendants's rely.[9] In *Cleveland Gear*, the CBA between the parties stated that: "The Insurance Agreement and Insurance Plan, as revised, shall be effective as provided therein and shall remain in full force and effect during the term of this collective bargaining agreement." *Cleveland Gear*, 1983 WL 2174 at *2. The court concluded that the parties did not intend the benefits to vest and there was no language indicating that the benefits were lifetime benefits. *Id.* In the instant case, the district court acknowledged the *Cleveland Gear* conclusion, but distinguished it. In *Cleveland Gear*, in addition to the general durational language in the CBA, the insurance agreement *itself* contained similar limiting language. The insurance plan stated that it remained in effect "until discontinued or superseded either in whole or in the termination or suspension of such Collective Bargaining Agreement." *Cleveland Gear*, at *3. Moreover, the district court in the instant case noted that the agreements in *Cleveland Gear* did not contain language that tied health insurance benefits to pension benefits as is the case here.

Likewise, the agreements in *Bittinger* were devoid of any language that tied health insurance benefits to pension benefits. The defendants rely on *Bittinger* principally because the Summary Plan Descriptions[10] in *Bittinger* reserved to the company the "absolute right, through the collective bargaining process, to amend, modify, or discontinue any or all of the benefits described in the [labor agreement] or the [health care plan] . . ." *Bittinger*, 83 F. Supp. 2d at 858. In the plans at issue here, from 1974 to 1980 the Summary Plan Descriptions also contain some reservation of rights via the following language: "It is hoped that the Group Policies will be continued indefinitely through the years, but your employer necessarily reserves the right, subject to the applicable provisions of the Labor Agreement between the Union and the Company, to terminate or change the Plan in the future." *Yolton*, 318 F. Supp. 2d at 468. The district court rejected the defendants's arguments that this language permitted the modification of retirement benefits by finding that the "right to modify the Group Insurance Plans is expressly limited to the terms of the [CBAs]." *Id.* Because the district court found that the CBA creates the vested lifetime benefits, the court further concluded that this language does not reserve to the defendants the right to modify those benefits. *Id.*

Regarding the Summary Plan Descriptions from the post-1980 agreements, the district court noted that they no longer included the reservation language, but rather a "Cessation of Benefits" provision stating that coverage will cease if the plan is cancelled in whole or in part. *Id.* The Cessation of Benefits refers to "the Sections of this booklet entitled 'Retirement' and 'Termination of Coverage,'" where there is no "Cessation of Benefits" provision. *Id.* "Rather this section, like the Group Insurance Plan, only ties the continuation of retirement benefits to the retiree's or surviving spouse's eligibility for pension benefits: 'Employees who retire under the J.I. Case

---

[9] Of note, *Bittinger* was decided by the same district court as the instant case.

[10] A summary plan description is a publication explaining the benefits of a particular welfare benefit plan and ERISA requires employers to distribute the descriptions to employees. 29 U.S.C. § 1022. Furthermore, this Court has held that "statements in a summary plan are binding and if the statements conflict with those in the plan itself, the summary shall govern." *Edwards v. State Farm Mut. Auto Ins. Co.*, 851 F.2d 134, 136 (6th Cir. 1988).

Pension Plan for Hourly Paid Employees, or their surviving spouses eligible to receive a spouse's pension under the provisions of that plan, will be eligible for the benefits described in this section.'" *Id.* Further, this section provides that: "Except where noted, the benefits and maximums under these *continued* coverages *will be the same as those that were in effect on the day preceding your retirement.*" *Id.* (emphasis added).[11]

Finally, while the plain language of the CBAs requires us to conclude that the district court did not abuse its discretion by issuing the injunction, we also note that like the *Golden* case, "[d]efendant's conduct also indicates that plaintiffs'[s] benefits were vested." *Golden*, 845 F. Supp. at 415. The district court identified substantial evidence indicating an understanding that the health insurance benefits were lifetime benefits. This evidence includes statements from Case benefits employees that they were told and in turn told retiring employees "that their medical insurance benefits would continue unchanged for their lifetime . . ." *Yolton*, 318 F. Supp. 2d at 469. A letter from Case's Director of Benefits & Practices sent to retirees in 1971 stated that the Company would fully cover benefits and that benefits would be in effect for life. *Id.* Documents related to various plant shutdown retirement agreements reflect that health insurance benefits "continu[ed] unchanged" "[f]or lifetime." *Id.* Medical insurance cards issued to retirees from Case's Industrial Relations Department in Terre Haute, Indiana contain the words "Lifetime" or "Lifetime Coverage." *Id.* The plaintiffs also presented benefits information issued to employees upon retirement that stated that the retiree and his wife were entitled to full health insurance coverage and that if the retiree pre-deceased his wife, her coverage "would continue as before" and would only change if she remarried. *Id.* at 469-70. Further, under a section entitled "Spouse's Benefits," the summary provided to the employee states that "In the event that you should die before your spouse and a spouse's option was spplied [sic] for, she will receive 55% of your pension for her lifetime along with the insurance which was mentioned previously." *Id.* at 470. The plaintiffs further offered affidavits of numerous other retirees and surviving spouses who were told by Case benefits representatives that they would receive post-retirement lifetime health insurance coverage fully paid for by the company. *Id.* Some of the affidavits include the accompanying documentation promising fully funded health insurance for life. *Id.*

On the other side, the defendants presented the testimony of Case's chief union negotiator and the former Director of Employee Benefits who stated that the company understood benefits to last only as long as the CBAs were in effect and that benefits were not fixed. *Id.* at 470. The district court rejected this testimony finding that it was not entitled "to considerable weight" because the union negotiator is still employed by Case and the former director receives $20,000 per month in consulting fees from the company. *Id.* at 471.

The most relevant extrinsic evidence the defendants present is evidence that during the negotiations that led to the FAS-106 Letter, UAW asked to add "lifetime" language to the Letter which was rejected by the company. *Id.* The defendants argue that this demonstrates that the parties understood that the benefits were not vested. The district court rejected this argument, finding that it "does not necessarily mean that the union's representatives believed that the earlier agreements did not provide vested health care benefits. The representatives may have been attempting to more clearly state what they believed earlier agreements provided, particularly where the 'agreement' at issue established other limitations on those benefits." *Id.* As the injunction issued by the district court is a preliminary injunction, the defendants may continue to press their arguments below, but we do not find them sufficient to demonstrate that the district court abused its discretion in this case.

---

[11]The section also provides that "The cost of this coverage is fully paid by the Employer." *Yolton*, 318 F. Supp. 2d at 468.

For all of the reasons discussed, the district court did not abuse its discretion by concluding that the plaintiffs were likely to succeed on the merits of their claim that they were entitled to fully funded lifetime health care benefits.

None of the parties's briefs contest the additional inquiries in the preliminary injunction context, and we find the district court's conclusions sound. The district court found that the plaintiffs would suffer irreparable harm without the injunction. *Id.* at 471-72. The court pointed to the limited and fixed incomes of the retirees, resulting in an inability to meet the expense of the premiums or resulting in retirees being unable to afford prescriptions or doctor visits. *Id.* Additionally, the court noted that to receive any health insurance benefits, El Paso was requiring the plaintiffs to contribute $501 *per month*. Accordingly, "the Court can surmise that the putative class members overall cannot afford to contribute such an amount until this case is resolved. Unable to afford the $501 premium, Plaintiffs will lose their health insurance, will not be able to pay for necessary prescription medications, and will not receive all of the medical care they need. Reimbursing Plaintiffs for their contributions at the end of the case, therefore, will not afford them relief." *Id.* at 472.

The district court also found that while the injunction will place a substantial expense on the defendants, this factor did not weigh heavily against the injunction. *Id.* at 473. According to the district court, "Defendants have paid the full costs of health care benefits for retirees and their surviving spouses for years prior to August 2002, and in this Court's opinion, the financial impact on Defendants being required to continue to pay these benefits is far less than the financial burden which would be placed on Plaintiffs if their request for a preliminary injunction is denied." *Id.* Finally, the district court found that the injunction supports the public interest in enforcing CBAs and preventing ERISA and LMRA violations. *Id.*

We therefore conclude that the district court did not abuse its discretion by issuing the injunction. Prior cases of this Court have highlighted factors indicating an intent to vest benefits that were present in this case. Additionally, we believe that the district court correctly interpreted the plain language of the CBAs and Group Insurance Plans as well as the agreement as a whole. The language tying health care benefits to pension benefits and the context of the bargaining demonstrate an intent to provide lifetime benefits. Furthermore, we do not believe that the general durational language in the CBA limits the duration of the health care benefits themselves, but rather merely provides a limitation on the agreement itself. The use of identical language in the CBAs referring to pension benefits and health care benefits provides strong additional support that the benefits are tied together and that they are lifetime benefits. Even if the agreements were ambiguous, the extrinsic evidence cited by the district court would support its finding and would not lead to the conclusion that the district court abused its discretion in issuing the injunction.

### C. Whether El Paso or CNH America is Liable for the Health Care Benefits

The remaining dispute is between El Paso and CNH America. Each contends that the other is liable for the plaintiffs's health insurance benefits above the apparent cap imposed by the FAS-106 Letter. CNH America contends that El Paso, as Tenneco's successor, is solely responsible for all of the plaintiffs's health care benefits. El Paso argues that in the 1994 Reorganization Agreement it assumed liability for pre-IPO retiree health care benefits subject to the negotiated cap set forth in the FAS-106 Letter; thus, according to El Paso, CNH America is liable for costs in excess of the cap.

Initially, in its opinion issuing the preliminary injunction, the district court found that El Paso is primarily liable for the entire health care costs for pre-IPO retirees and their surviving spouses. *Yolton*, 318 F. Supp. 2d at 474-75. The district court reasoned that the Reorganization Agreement's "Retained Liabilities" section provided that Tenneco assumed CNH America's liabilities for post-retirement health insurance benefits for pre-IPO retirees and their dependents. Nevertheless, the

court found that CNH America "has not been released from its liability to provide fully funded, lifetime health insurance benefits to its retirees and their surviving spouses." *Id.* at 474. Notwithstanding Tenneco's assumption of the liabilities, the court held that CNH America remains secondarily responsible to the plaintiffs for the cost of the benefits. In sum, the district court concluded "that El Paso is liable for the full costs of the pre-IPO retirees' and surviving spouses' health insurance benefits. The Court may subsequently conclude that [CNH America] is also liable for these costs." *Id.* at 475.

Following the district court's opinion, El Paso filed a motion for reconsideration pursuant to Federal Rule of Civil Procedure 60(b). In ruling on the motion in an opinion issued on March 8, 2004, the district court noted that its original conclusion that El Paso was primarily liable was based on the 1994 Reorganization Agreement. In its motion for reconsideration, El Paso argued that it was premature to resolve the issue of whether El Paso was required to indemnify CNH America for the health insurance benefits without providing El Paso the opportunity to address the issue and without fully resolving CNH America's liability for the costs as signatory to the relevant CBAs.

The court concluded "that El Paso is entitled to relief, as the Court erred in overlooking the fact that, as the signatory to the CBAs, [CNH America] retained liability for Plaintiffs'[s] health care costs despite El Paso's subsequent assumption of those liabilities in the Reorganization Agreement and Benefits Agreement." D. Ct. Op. of March 8, 2004 at 3. To reach this conclusion, the district court needed to address whether CNH America is a party to the CBAs — in essence, whether CNH America is the alter ego of JI Case.

CNH America's position is that it did not exist before July 1, 1994 when Case LLC it was created by JI Case executives; having not existed until this time, CNH America claims, it could not possibly have been a party to the CBAs signed before this date. CNH America further asserts that it is not the alter ego or successor of JI Case. The district court disagreed and found that CNH America is the alter ego or mere continuance of JI Case and therefore assumed the CBAs and their liabilities.

As the district court correctly noted, the Supreme Court has held that a successor corporation generally is not liable for its predecessors liabilities unless expressly assumed. *See e.g.*, *NLRB v. Burns Int's Sec. Servs.*, 406 U.S. 272, 279, 286-88 (1972). This rule is not absolute, however, as the Court has held that a CBA might remain in force "in a variety of circumstances involving a merger, stock acquisition, reorganization or assets purchase." *Id.* at 291. The Supreme Court has also held that when there is a "mere technical change in the structure or identity of the [old] employing entity, frequently to avoid the effect of the labor laws, without any substantial change in its ownership or management . . . the courts have little difficulty holding that the successor is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 210, 259 n.5 (1974) (citing *Southport Petroleum Co. v. NLRB*, 315 U.S. 100, 106 (1942)).

This Court has applied these principles in several relevant cases. To start, "[w]hether a company or individual is responsible for the financial obligations of another company or individuals is a question of federal law when it arises in the context of a federal labor dispute. Although state law cases may provide guidance in fashioning the content of federal law, they are not binding and thus do not control" the analysis. *NLRB v. Fullerton Transfer & Storage Limited, Inc.*, 910 F.2d 331, 335 (6th Cir. 1990). This Court recognized, however, that federal law, like state law, generally recognizes the concept of limited liability. As the Supreme Court has stated, "[t]he insulation of a stockholder from the debts and obligations of his corporation is the norm, not the exception." *NLRB v. Deena Artware, Inc.*, 361 U.S. 398, 402-03 (1960).

*Fullerton Transfer,* the case upon which CNH America relies, asked "which doctrine referred to as an 'alter ego doctrine' applies to this case." *Id.* at 366. "The alter ego doctrine was developed to prevent employers from evading obligations under the Act merely by changing or altering their corporate form." *NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986). Quite correctly, the Court recognized that the term alter ego "has accumulated a great deal of baggage in the context of labor disputes." *Fullerton Transfer*, 910 F.2d at 366. The doctrine is most commonly used in "labor cases to bind a new employer that continues the operations of an old employer in those cases where the new employer is 'merely a disguised continuance of the old employer.'"[12] *Id.* (quoting *Southport Petroleum, Co. v. NLRB*, 315 U.S. 100, 106 (1942)); *see also Howard Johnson Co.*, 417 U.S. 249 (1974). To determine alter ego status in this situation, courts ask "whether the two enterprises have substantially identical management, business, purpose, operation, equipment, customers, supervision and ownership." *Id.* (quoting *Nelson Electric v. NLRB*, 638 F.2d 965, 968 (6th Cir. 1981)); *see also NLRB v. Allcoast Transfer, Inc.*, 780 F.2d 576, 579 (6th Cir. 1986).[13] The Court described this as a "more relaxed, less exacting" application of the alter ego doctrine "[i]n order to effectuate federal labor policies." *Id.* Determination of alter ego status is a question of fact to be reversed only if clearly erroneous. *Allcoast Transfer*, 780 F.2d at 579 (citing *Southport Petroleum*, 315 U.S. at 106). In an alter ego analysis, "[n]o factor is controlling and all need not be present." *Tanaka Construction, Inc. v. NLRB*, 675 F.2d 1029, 1033 (9th Cir. 1982). The analysis is "flexible" and "no one element should become a prerequisite to imposition of alter ego status; rather, all the relevant factors must be considered together." *Allcoast Transfer*, 780 F.2d at 582.[14]

In *Fullerton Transfer*, however, the Court declined to apply the more relaxed alter ego doctrine because it found that the facts before it did not present a case where the alleged alter egos are "engaged in the same business as the original company . . . Rather, they are, respectively, a corporation engaged in a different business and stockholders and officers of another corporation." *Id.* at 337. Consequently, the Court determined that the rationales justifying application of the relaxed standard were absent. *Id.*

The facts here, however, indicate that the more relaxed standard is appropriate. CNH America argues otherwise; particularly, CNH America argues that the so-called relaxed doctrine applies only to situations where there is evidence of an intent to avoid labor obligations. It points to *Fullerton Transfer* in support of its claim, but the language of *Fullerton Transfer* is not helpful. All that *Fullerton Transfer* stands for is the conclusion that the relaxed standard was not appropriate for the particular facts of that case.

Furthermore, post-*Fullerton Transfer* cases repudiate CNH America's claim. *See e.g.*, *Wilson v. Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of Am., AFL-CIO*, 83 F.3d 747 (6th Cir. 1996). In *Wilson*, the Court rejected the defendants's insistence that the alter ego doctrine "applies only to situations in which a change in the corporate form allows an employer to evade collective bargaining obligations, and that common ownership and evidence of

---

[12]The Court also noted that "[i]ncreasingly, the term also is applied to so-called double-breasted operations to determine whether two or more coexisting employers performing the same work are in fact one business, separated only in form." *Id.* at 336.

[13]The Court mentioned that "[t]he successorship doctrine is often confused with the alter ego doctrine. The successorship doctrine is used to determine whether a new employer has an obligation to bargain when there is a bona fide sale of the employing company. A bona fide sale is found when there is any substantial change in ownership or management." *Id.* at 336 n. 6 (citation and quotation marks omitted).

[14]Moreover, even when a reorganization is supported by legitimate reasons, the employer may be prevented from avoiding its prior labor obligations. *Allcoast Transfer*, 780 F.2d at 582.

an intent to avoid labor agreements are essential to an alter ego claim." *Id.* at 758-59. CNH America nevertheless insists that the district court erred by making an alter ego finding without evidence of an intent to evade labor obligations. We disagree. This Court, even in light of the language of *Fullerton Transfer*, has made clear that "common ownership or an intent to evade federal labor law obligations are not necessary prerequisites to a finding of alter ego status." *Id.* at 759. We need not, therefore, look for evidence of CNH America's intent to evade any labor obligations in determining whether it remains liable under the CBAs as the alter ego to JI Case. Rather, "the essential inquiry under an alter ego analysis is 'whether there was a *bona fide* discontinuance and a true change of ownership . . . or merely a disguised continuance of the old employer." *Allcoast Transfer*, 780 F.2d at 579 (quoting *Southport Petroleum*, 315 U.S. at 106).

We conclude that the district court applied the appropriate standard. The court asked "whether the two enterprises have substantially identical management, business purpose, operation equipment, customers, supervision and ownership." D. Ct. Op. of May 8, 2004 (citing *Allcoast Transfer*, 780 F.2d at 579 (citations omitted)). JI Case and UAW were the parties to the CBAs. In 1994, Tenneco divested itself of its agriculture and construction assets by creating Case Equipment Corporation (which eventually became Case LLC and then CNH America). Upon the creation of the new corporation, Tenneco, JI Case, and Case Equipment entered into the Reorganization and Benefits Agreement whereby Tenneco and JI Case's assets were transferred to Case Equipment. Immediately following the reorganization, Case Equipment conducted an IPO and changed its name to Case Corporation and in September 2002 to Case LLC and later to CNH America.

Other factors indicate that CNH America is, for purposes of this case, the alter ego of JI Case. The Reorganization Agreement was signed for Case Equipment by Jean Pierre Rosso as its President and CEO. D. Ct. Op. Of May 8, 2004 at 6. At the time, Mr. Rosso was also the president and CEO of JI Case. *Id.* Prior to the Reorganization, Mr. Rosso, as the president and CEO of JI Case, sent a letter to retirees announcing that "[t]he leadership of Case and Tenneco have announced an action that, when completed, *will make Case* a publicly traded company." *Id.* The Reorganization Agreement was signed for JI Case by Theodore R. French, its Senior Vice President, CFO, and Treasurer. *Id.* at 6-7. Mr. French then held the same position with Case Equipment and in fact signed the Benefits Agreement as Senior Vice President, CFO, and Treasurer of Case Equipment *and* JI Case. *Id.*

A few days after the Reorganization Agreement was executed, JI Case executed a Certificate of Amendment, effective July 1, 1994 at 12:01 a.m., changing its name to Tenneco Equipment Corporation. *Id.* at 7. Effective at 12:02 a.m., Case Equipment changed its name to Case Corporation. *Id.* "The same individual, acting in the same capacity for the new and old Case Corporations, executed both certificates." *Id.*

The district court also found that those individuals who were officers of JI Case prior to 12:01 a.m. on July 1, 1994, were the same individuals named as officers of Case Corporation at 12:02 a.m. *Id.* The new Case Corporation (Case LLC and then CNH America) operated under the same name as JI Case in the same manufacturing facilities with the same officers, employees, and business. *Id.* The new Case Corporation continued to correspond with retirees of JI Case using the same JI Case letterhead previously used by the old corporation. *Id.* at 7-8. "The letters from the new Case Corporation were signed by the same employees, working at the same locations, and in the same positions as the letters from the old Case Corporation." *Id.* at 8.

The Benefits Agreement included a provision that, except as otherwise specifically stated within the agreement, CNH America assumed and agreed to pay "all employment, compensation and benefit liabilities, whether arising prior to or after [the date of the agreement], with respect to all employees and former employees of [each subsidiary of Tenneco that assigned assets used in the farm and construction business to Case Corporation]." *Id.* Furthermore, CNH America assumed

all CBAs covering employees of the farm and construction equipment business of JI Case, including the 1990 CBA. *Id.*

Based on the above factors, the district court concluded that the plaintiffs were likely to establish that CNH America is the alter ego of JI Case and therefore retained JI Case's labor law obligations. *Id.* The court further concluded, however, that the plaintiffs were *not* likely to succeed in their claim against El Paso regarding the labor law obligations because Tenneco was never a party to any CBAs. Thus, the district court concluded that the plaintiffs "will not likely succeed in establishing that El Paso is obligated *under those agreements* to pay the costs of Plaintiffs'[s] health insurance benefits." *Id.* at 9 (emphasis in original) (citing *Serv., Hosp., Nursing Home & Pub. Employees Union v. Commercial Property Servs., Inc.*, 755 F.2d 499, 503 (6th Cir. 1985) (concluding that non-signatory to a CBA who is neither a successor or alter ego of signatory to the CBA cannot be bound by the provisions of the agreement)).

Finally, the district court noted that it may ultimately be correct in its initial conclusion that El Paso assumed CNH America's obligations to provide the benefits in the Reorganization Agreement, but noted that the *plaintiffs* do not seek relief based upon the Reorganization Agreement. Instead, El Paso's liability arises only as a result of CNH America's *cross-claim* against El Paso for breach of those agreements. Therefore, the court concluded it was premature to adjudicate that claim when addressing the plaintiffs's motion for a preliminary injunction. We agree with the district court's approach and affirm its judgment.

## IV.

### No. 04-2492: CNH America's Cross Claim Against El Paso

*A.    Additional Background*

The remaining issue is CNH America's cross-claim against El Paso. This claim requires the Court to determine who will pay for the benefits should the plaintiffs succeed on their claim. To start, we turn to yet another opinion from the district court. On September 3, 2004, the district court granted CNH America summary judgment on its cross-claim against El Paso. The district court found that pursuant to the liability and indemnification provisions of the Reorganization and Benefits Agreement, El Paso had indemnified CNH America against *all* pre-Reorganization obligations CNH America had for retiree benefits. This included liabilities above the alleged cap agreed to in the FAS-106 Letter.

To recap, on October 3, 1993, as part of the Extension Agreement, JI Case and the UAW agreed to adopt the FAS-106 Letter of Agreement. The letter states:

> This will confirm our understanding that the average per capita annual cost to the Company of providing medical and related benefits under the Case Group Benefit Plan to retired employees and surviving spouses of deceased employees shall not exceed $2,750 for Medicare eligible individuals and $8,500 for those individuals who are not eligible for Medicare. Notwithstanding the foregoing, no covered person shall be required to pay a portion of any excess amount prior to April 1, 1998.

When issuing the preliminary injunction discussed above, the district court found that this Letter had no effect on those retiring before its adoption (because those benefits vested) and therefore limited the scope of the preliminary injunction to those retiring before the date of the Letter.

During the Reorganization in 1994, additional agreements were signed allocating assets and liabilities of the various corporate entities. Section 3.02(c) of the Reorganization Agreement describes certain liabilities assumed by Tenneco for the pre-IPO retires:

> Except as set forth in the Benefits Agreement or the Tax Sharing Agreement, Tenneco or a Tenneco Subsidiary, as appropriate, (i) shall assume the Retained Liabilities effective as of the Reorganization Date and (ii) shall thereafter pay, perform and discharge in due course all of the Retained Liabilities.

The Reorganization Agreement then defines "Retained Liabilities" as:

> (ii) the Case Liabilities for postretirement health and life insurance benefits (to the extent that Case is obligated on the Reorganization Date) of retirees of the Case Business in the United States and current employees of the Case Business in the United States who retire on or before July 1, 1994 and their dependents as more fully described in the [Allocation] Agreement.

CNH America agreed to assume all other Case liabilities "other than the Retained Liabilities." In addition to the language in the Reorganization Agreement, the Allocation (or Benefits) Agreement has additional language providing guidance. Section 7.2.2 of the Allocation Agreement states:

> Subject to Section 7.4,[15] Tenneco shall retain all liability with respect to postretirement health and life insurance benefits to the extent that Case is obligated on the Closing Date [i.e., the date of the agreement] for United State Employees retired prior to the Closing Date and their dependents.

Article V of the Reorganization Agreement further provides indemnification provisions requiring CNH America and Tenneco to defend and indemnify one another for failing to perform their obligations under the agreements. Section 5.01 requires Tenneco to

> indemnify, defend and hold harmless [Case LLC] . . . from and against any and all Liabilities, and any claims, demands and rights . . . arising out of or due to . . . the failure or alleged failure of Tenneco or any Tenneco Subsidiary to pay, perform or otherwise discharge in due course any of the Retained Liabilities . . . and . . . to perform its obligations under this Agreement or any of the Ancillary Agreements.

Section 5.02 required the same of CNH America with respect to its obligations.

The district court reviewed the agreements pursuant to Delaware law as provided for in the agreements themselves. Under Delaware law, the terms of a contract "will be controlling when they establish the parties' common meaning so that a reasonable person in the position of either party would have no expectation inconsistent with the contract language." *Eagle Indus., Inc. v. De Vilbiss Health Care, Inc.*, 702 A.2d 1228, 1232 (Del. 1997) (citation omitted). Thus, in the absence of any

---

[15]Section 7.4 provides the following limitation on the liabilities Tenneco assumed.

Tenneco shall not be liable for any postretirement health and life insurance benefit costs which result from any action of [Case LLC] after the Closing Date which increases such benefits, except to the extent that such benefit increases are required by applicable law. To the extent that Tenneco is not liable for such benefits, [Case LLC] shall be liable. Without limiting the generality fo the foregoing, it is specifically provided that Tenneco shall not be liable for any increase in the cost of providing postretirement health and life insurance benefits that result from any agreement by [Case LLC] to increase or otherwise modify the per capita annual cost limits set forth in the October 3, 1993 agreement between Case and the UAW regarding "FAS-106 out-year Cost Limiters."

ambiguity, the express terms of the contract control. *Haft v. Dart Group Corp.*, 841 F. Supp. 549, 564 (D. Del. 1993) (citing *Harry H. Rosin Co. v. Eksterowicz*, 73 A.2d 648, 651 (Del. Super. Ct. 1950), and *Myers v. Myers*, 408 A.2d 279, 280 (Del. 1979)). Extrinsic evidence may not be used if the terms of a contract are unambiguous. *Eagle Indus.*, 702 A.2d at 1232 (citations omitted).

The district court further noted that contract interpretation is a question of law. *Hudson v. State Farm Mut. Ins. Co.*, 569 A.2d 1168, 1170 (Del. 1990). If a contract is unambiguous, therefore, summary judgment is appropriate because extrinsic evidence is neither relevant nor admissible to ascertain the parties's intent. *SBC Interactive, Inc. v. Corporate Media Partners*, 714 A.2d 758, 761 (Del. 1998). Finding the contract unambiguous, the district court concluded "that since Tenneco (and thereby El Paso) assumed '*all* liability with respect to postretirement health and life insurance benefits to the extent that Case [was] obligated on the Closing Date . . .' and since that liability actually included costs above the cap at least for individuals retiring prior to the effective date of the FAS-106 Letter, El Paso is liable for the above-cap costs of Plaintiffs'[s] health insurance benefits."

CNH America argued that Tenneco's liability for pre-IPO retiree health benefits is unambiguously established by Section 3.02(c) of the Reorganization Agreement and Section 7.2.2 of the Allocation Agreement. El Paso argued that Tenneco assumed only below-cap costs of those benefits because Section 3.02(c) and Section 7.2.2 limit liability "to the extent that Case is obligated on the Reorganization Date." El Paso argued that the parties's agreements were premised on the belief that benefits were capped as of that date, and therefore, Tenneco assumed only the below-cap costs. El Paso supported its argument with extrinsic evidence. The district court rejected the extrinsic evidence, concluding that:

> This extrinsic evidence is not persuasive. It is simply statements made by parties *after* the Reorganization Agreement was entered into and reaffirms the parties' belief that retiree health benefit costs were capped. There is no dispute that at the time of the agreement El Paso (or Tenneco) and Case LLC believed that the costs were capped. This extrinsic evidence does not persuade the Court that it was the intent of the parties that Case LLC retained the liability for the above-cap costs.

The district court noted that the problem in this case arises because of the FAS-106 Letter. The court concluded already, however, that the Letter does not cap the benefits of pre-Letter retirees and therefore, CNH America's liability was not capped with respect to those retirees. It therefore follows, according to the district court, that El Paso assumed these above-cap liabilities.

The district court found additional support for its conclusion in other parts of the parties's agreements. The Reorganization Agreement's definition of "Liabilities" includes "foreseen or unforeseen" liabilities as well as "known or unknown" liabilities arising pursuant to, among other things, an "Action," "before any court." Therefore, the district court stated:

> In summary, the Court concludes that the terms of the Reorganization Agreement and Allocation Agreement unambiguously reflect the parties'[s] intent that Tenneco would assume all of Case's liability for postretirement health insurance benefits to the extent Case was obligated for those benefits on June 23, 1994, including those which were unforeseen and/or unknown at the time. The Court has preliminarily determined that the FAS-106 Letter did not effectively cap Case's obligations with respect to hourly retirees who retired or elected to retire prior to the letter's effective date. It therefore follows that on June 23, 1994, Case was obligated for the full costs of Plaintiffs'[s] health insurance benefits. Pursuant to the unambiguous terms of the Reorganization Agreement and Allocation Agreement, Tenneco and now El Paso assumed those obligations.

Thus, the district court granted summary judgment in favor of CNH America.

>    B.    *The Contracts Are Unambiguous and the District Court Properly Granted Summary Judgment to CNH America*

On appeal, El Paso argues first that the agreements cannot be "read as conclusively establishing" its liability — that is, El Paso argues that its interpretation of the agreements is a reasonable one that should be tried to a jury. Second, El Paso argues that there is at least a latent ambiguity based on CNH America's conduct over a five-year period, its failure to ever state that El Paso had obligations extending beyond the capped amounts, and its repeated statements acknowledging that El Paso's obligations were limited.

Regarding its first argument, El Paso points to the Delaware Supreme Court's decision in *Eagle Indus.*, 702 A.2d 1228. The court held that:

> Contract terms themselves will be controlling when they establish the parties'[s] common meaning so that a reasonable person in the position of either party would have no expectations inconsistent with the contract language. When the provisions in controversy are fairly susceptible of different interpretations or may have two or more different meanings, there is ambiguity.

*Id.* at 1232. El Paso argues that the contract language is fairly susceptible to different interpretations and that summary judgment was therefore inappropriate. El Paso's argument is essentially that the district court erred by ignoring the language "to the extent that Case is obligated on the Closing Date." This language, El Paso argues, is evidence of the parties's intent to limit liabilities according to their "contemporaneous understanding of what they were." Brief of El Paso at 22. Thus, according to El Paso, any liabilities not contemporaneously allocated were assumed as contingent obligations by CNH America. For this, El Paso points to section 2.1 of the Benefits Agreement.

On the other hand, CNH America points to the contract language as unambiguously establishing that Tenneco retained all liabilities related to the health care costs whether "foreseen or unforeseen, . . . accrued or unaccrued, known or unknown," that were incurred by JI Case prior to the Reorganization. Moreover, CNH America argues that it is irrelevant that the defendants believed that Tenneco's liability was capped by the FAS-106 Letter. The agreement explicitly allocated the risk of unforeseen liabilities on Tenneco. Regarding the disputed language ("to the extent Case is obligated on the Closing Date"), CNH America argues that it merely creates a clear division between Tenneco's "Retained Liabilities," i.e., those obligations to pre-Reorganization retirees on the closing date, and CNH America's future liabilities, i.e., those obligations to employees who would retire *after* the Closing Date. According to CNH America, the fact that it ended up with more liabilities on the Closing Date than Tenneco suspected does not turn the tide in El Paso's favor because this risk was specifically assumed by Tenneco by the language "unforeseen and unknown liabilities." Finally, CNH America argues that its course of conduct is not relevant because the contract language is unambiguous and "[i]f a contract is unambiguous, extrinsic evidence may not be used to interpret the intent of the parties, to vary the terms of the contract or to create an ambiguity." *Eagles Indus.*, 702 A.2d at 1232.

We believe that the district court correctly concluded that the contract is unambiguous and properly granted summary judgment in favor of CNH America. We recognize that the defendants claim that when they signed the FAS-106 Letter, they intended to cap JI Case's liability in October 1993.[16] When Case and Tenneco signed the reorganization agreements in June 1994, they both anticipated that Case's obligations for retirement benefits were capped by the FAS-106 Letter and

---

[16]The Union claims, however, that the FAS-106 Letter was signed as a temporary accounting accommodation.

that the retirees themselves would be responsible for above-cap costs. Hence, the parties included the language that Tenneco would assume Retained Liabilities "to the extent that Case is obligated on the Reorganization Date . . ." In the absence of other language in the contract, we might have been persuaded to conclude that the parties were agreeing that Tenneco was assuming liability for a specific dollar amount — the below-cap costs. We would have been compelled to conclude as much if the parties had specifically so stated. Nevertheless, the parties were not so specific and we are required to turn to other language and read the document as an integrated whole. In the parties's definition of Liabilities, we find that Liabilities (and hence Retained Liabilities) includes those liabilities "foreseen or unforeseen . . . known or unknown . . . accrued or unaccrued." Thus, we read the contract unambiguously to allocate to Tenneco Case's Retained Liabilities, including those unforeseen or unknown. The parties's beliefs about the *extent* of the liabilities and their actions pursuant to those beliefs do not demonstrate any ambiguities in the contract language allocating unknown or unforeseen liabilities to El Paso. That is, the only ambiguity in this case is the amount of the liabilities because of the parties's assumption that the FAS-106 Letter capped benefits. The language of the agreements, adopted by sophisticated entities with able counsel, allocated, as most contracts do, the risk of increased liabilities upon one of those parties — El Paso. "Contract language is not ambiguous simply because the parties disagree concerning its intended construction." *Eagles Indus.*, 718 A.2d at 1232 n.8.

El Paso does rely heavily on CNH America's course of conduct after the Reorganization — specifically the fact that it never stated that El Paso had liability above the caps, the fact that it paid above cap costs of $25 million in 1998, and its repeated written statements that El Paso's obligations were limited. The extrinsic evidence, however, cannot be considered when contract language is unambiguous. In any event, we also agree with the district court that the extrinsic evidence merely demonstrates the parties's belief that their obligations were capped by the FAS-106 Letter and does not indicate that the indemnification contract language itself was ambiguous.

In sum, Section 7.2.2 provides that Tenneco would assume all postretirement health care benefits for those who retired prior to July 1, 1994 to the extent that JI Case was obligated on the Closing Date. The district court has not abused its discretion in issuing a preliminary injunction on the basis that the benefits were lifetime benefits vested for those who retired prior to October 3, 1993 and, thus, the FAS-106 Letter could not limit those benefits. This means, therefore, that despite the parties's error regarding the extent of liabilities, CNH America is likely to be held liable for the vested lifetime health care benefits for those who retired prior to October 3, 1993 on the Closing Date. Section 7.2.2, however, provides that Tenneco assumed those liabilities. This is reinforced by the parties's definition of "Liabilities" to include those "absolute or contingent, matured or unmatured, liquidated or unliquidated, foreseen or unforeseen . . .accrued or unaccrued, known or unknown, whether having arisen or arising in the future." We are convinced that the contract is unambiguous and therefore affirm the district court's judgment.

Finally, based on this interpretation, the district court did not abuse its discretion in cutting off discovery or in fashioning an equitable remedy under the indemnification provision.

## V.

For the foregoing reasons, we AFFIRM the district court's judgment in all respects on each of the four appeals.